**Tyrone JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 10–CF–1433.**

District of Columbia Court of Appeals.

Argued March 27, 2012.

Decided Dec. 13, 2012.

---

Ian A. Williams, Williams, for the appellant.

Amanda J. Winchester, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Mary B. McCord, Assistant United States Attorney, were on the brief.

Before BLACKBURNE–RIGSBY and BECKWITH, Associate Judges, and BELSON, Senior Judge.

BECKWITH, Associate Judge:

Appellant Tyrone Jackson entered a conditional guilty plea to one count of possession with intent to distribute cocaine after police stopped his van for an apparent window tinting violation, searched the van, and found cocaine concealed in the horn of the steering wheel. Mr. Jackson argues, among other things, that the cocaine and other items found in the van should have been suppressed because the police searched his van without reasonable articulable suspicion that he was armed and dangerous. We agree with Mr. Jackson that the police did not have reasonable suspicion to believe they were dealing with a dangerous person, and that their search of the van thus violated the Fourth Amendment. We therefore reverse the trial court's denial of Mr. Jackson's motion to suppress.

## I. Background

At the suppression hearing in this case, United States Park Police Officer Lando Norris testified that on March 17, 2010, at around 10:48 p.m., he was driving a marked police cruiser south on Minnesota Avenue in the southeast quadrant of Washington, D.C., when he noticed a white Chevrolet van with what he suspected was illegal window tinting stopped at a stop sign on 18th Street waiting to turn left onto Minnesota Avenue.[1] From about 75 yards away, Officer Norris could discern through the front windshield that a woman was driving the van, which had Maryland plates. Having pulled over vehicles for suspected window tint violations between 1500 and 2000 times, Officer Norris estimated that the window tinting on the van was darker than what was allowed in either Maryland or the District of Columbia.

After the van turned onto Minnesota Avenue, Officer Norris activated the lights on his cruiser and the van pulled over immediately. A streetlight illuminated the area and provided "pretty fair lighting." When the van came to a stop Officer Norris noticed that it "began to rock" and "there was a lot of shaking," so instead of running the registration, he immediately

1. Officer Norris testified that he had made narcotics arrests in that area in the past.

got out of his cruiser and walked to the driver's side door. Officer Norris believed that Officer Alton, another police officer who was driving a cruiser just a car or two ahead of him, had seen him initiate the stop and was doubling back to assist, though he was alone at the outset.

As he approached the vehicle's door with his flashlight, Officer Norris could see inside the van and immediately noticed that a man—Tyrone Jackson—was sitting in the driver's seat, and that "obviously they had switched seats because the female was no longer in the driver's seat, she was now in the passenger seat." Officer Norris also saw "a lot of movement," "a commotion going on in the front dash area," and "hands moving in the dash area." He said he "was able to see [Mr. Jackson's] hands" and that he saw "movement along the dash area"—"there were just unnecessary movements." According to Officer Norris, "it wasn't anything normal that you see on a traffic stop" and it was "something [he] hadn't seen before or that [he was] not used to seeing." He also stated that "a lot of people when they do a lot of movement around usually they start to place weapons or try to retrieve weapons or what have you."

Officer Norris immediately opened the driver's door to find that Mr. Jackson's hands were "visible" and "in plain view" at "the bottom part of the steering wheel" and "resting down by his lap." Officer Norris twice asked Mr. Jackson what he had been doing, to which he twice replied "nothing," though Mr. Jackson was also "pretty forthcoming" in acknowledging that he and the woman had switched places after the officer stopped them because she was not licensed to drive. Officer Norris ordered Mr. Jackson to step out of the van "because of all the movement." When he asked Mr. Jackson whether he had any weapons on him, Mr. Jackson responded no, and the officer found no

weapons after Mr. Jackson agreed to be patted down. Mr. Jackson "had [a] nervous approach about him" and Officer Norris could "feel how hard [Mr. Jackson's] heart was beating."

By this point Officer Alton had arrived and Officer Norris briefed him. Officer Alton handcuffed the female passenger and had her sit on the sidewalk while Officer Norris handcuffed Mr. Jackson, placed him in the back seat of the cruiser, and told him he was not under arrest. Officer Alton then searched the front passenger compartment of the van for weapons and found a one-eighth-full bottle of gin under the van's rear floorboard, a small hatchet beside the driver's seat, and a couple of empty Ziploc bags. Officer Alton also removed the cover of the horn on the steering wheel after noticing that it looked out of position. There, he discovered numerous Ziploc bags containing a rock-like substance that subsequent testing indicated to be cocaine.

After determining that the window tinting was much darker than the legal limit in both the District of Columbia and Maryland, and that it allowed only 20 percent of the ambient light to be transmitted through the windows, Officer Norris issued Mr. Jackson a verbal warning for the violation. He determined only after police searched the van that although Mr. Jackson had a valid driver's license and the van was registered to him, the registration for the van had expired.

In its ruling on the suppression motion, the trial court noted that the police indisputably had probable cause to stop the van based upon the tinting violation, and that the key question therefore was whether they had reasonable articulable suspicion to search the vehicle. In the court's view, while the driver and passenger switching places "could heighten and did heighten [Officer Norris's] suspicion," it was "this

movement towards the dash area" that Officer Norris observed as he approached the driver that most supported the officer's concern "that the defendant might be trying to retrieve a weapon."

The court then went on to consider whether the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), nevertheless invalidated the search. *Gant* held that a warrantless search of a suspect's vehicle incident to a lawful arrest was unreasonable under the Fourth Amendment where the suspect was handcuffed and secured in a patrol car. *Id.* at 344, 129 S.Ct. 1710. The trial court concluded that *Gant* did not render the search invalid here because, although Officer Norris could have arrested Mr. Jackson for driving an unregistered automobile, he had not yet determined that the van was unregistered at the time of the search. Thus, as Mr. Jackson was not under arrest when he was in the back of the cruiser, and as there was "a very distinct possibility that [he] would return to the car after the investigatory stop and regain access to the weapon," police had the right under *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to conduct what amounted to a "pat down of the passenger compartment or those places where a suspect may gain immediate control of weapons." The court also found that removing the horn was not outside the scope of such a search for weapons as "it's about as reachable proximity as you can possibly get." It therefore denied Mr. Jackson's motion to suppress the evidence that was discovered during the search.

At the conclusion of the suppression hearing, Mr. Jackson entered a conditional plea to possession with intent to distribute cocaine, reserving his right to appeal the trial court's denial of the suppression motion. This appeal followed.

## II. Analysis

Mr. Jackson argues on appeal that the trial court should have suppressed the physical evidence found in his van because the police lacked reasonable suspicion to believe Mr. Jackson was dangerous and because the search also exceeded the allowable scope of a vehicle search for weapons under *Michigan v. Long, supra*. Mr. Jackson also argues that the Supreme Court's decision in *Arizona v. Gant, supra*, precluded the search as Mr. Jackson was handcuffed in the back of a police cruiser and not within reaching distance of the passenger compartment at the time of the search.

 We apply a de novo standard of review to the trial court's conclusion that the search of Mr. Jackson's van was justified by reasonable articulable suspicion. *Turner v. United States*, 623 A.2d 1170, 1171 (D.C.1993). In *Michigan v. Long*, the Supreme Court authorized what amounts to a *Terry* frisk of a vehicle's passenger compartment during a lawful traffic stop, allowing a search for weapons on something less than probable cause where "the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049–50, 103 S.Ct. 3469 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). To determine whether the police officer had a "particularized and objective basis" for his suspicion, we look at the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

The trial court in this case viewed Mr. Jackson's movement around the dashboard as the pivotal fact creating reasonable suspicion to justify the search of the van. Because we likewise view Mr. Jackson's gesture as "[t]he knife's edge of that decision," *Powell v. United States*, 649 A.2d 1082, 1090 (D.C.1994) (Farrell, J., concurring), and because the circumstances would likely fall short of constituting reasonable suspicion in the absence of that gesture, we turn to that factor first in the totality-of-the-circumstances analysis.

Officer Norris testified that when he approached the driver's side of Mr. Jackson's van, he saw "hands moving in the dash area," "a lot of movement within the front dash compartment area," and a "commotion going on in the front dash area." The trial court specifically credited his testimony "that he did see this movement towards the front dash" and concluded "that based on the motion, that certainly gave him a reasonable articulable suspicion that the defendant might be hiding or trying to retrieve contraband." In our view, this gesture was not sufficient to arouse a reasonable fear in Officer Nelson that Mr. Jackson was presently dangerous, as there was nothing particularized about the gesture indicating he was hiding or retrieving a weapon.

Our view is consistent with other decisions of this court that have wrestled with the extent to which certain gestures by people in vehicles supported police officers' reasonable belief that an occupant was armed and dangerous. While the totality of circumstances differs in every case, and other factors may tip the balance regardless of the nature of the particular gesture in a given case, our decisions involving so-called furtive gestures have generally drawn a distinction between conspicuous reaches under the seat and less distinct bending motions or movements toward the dash, the console, or the passenger seat. We have found a gesture to give rise to reasonable suspicion when a suspect is seen reaching down and appearing to place something under the seat, *McGee v. United States*, 270 A.2d 348, 349 (D.C.1970), "pulling something out of his belt and placing it under his seat," *United States v. Green*, 465 F.2d 620, 623 (D.C.Cir.1972),[2] or lifting his body up, then bending way down as if putting something underneath the driver's seat, *James v. United States*, 829 A.2d 963, 964, 966–67 (D.C.2003). *See also United States v. Glover*, 851 A.2d 473, 477 (D.C.2004) (noting that a search of Glover's car would likely have been justified if the trial court credited testimony that Glover made "a suspicious reaching movement toward the area below his seat"). When a suspect was seen trying to shove something down the front part of his pants under his coat, then holding his hands over that area, the court readily described the gesture as "an unambiguous effort to conceal a weapon." *In re D.E.W.*, 612 A.2d 194, 195 (D.C.1992).

On the other hand, gestures have not tended to engender reasonable suspicion when a driver was "bent over" and "making movements towards the middle of the car, towards the dashboard," *Watts v. United States*, 297 A.2d 790, 791, 793 (D.C. 1972), where an officer observed the driver "bend or duck towards the passenger seat," *Powell*, 649 A.2d at 1085, where a man in the front passenger seat got nervous and "was fumbling with something . . . in the area of his seat," *Tyler v. United States*, 302 A.2d 748, 749 (D.C.1973), or when a rear seat passenger moved his

---

**2.** This court has stated with respect to the D.C. Circuit's opinion in *Green* that "it is fair to say that we adopted its holding as part of our case law" when we relied upon it in *United States v. Thomas*, 314 A.2d 464, 469 (D.C.1974). *See James v. United States*, 829 A.2d 963, 964, 967 (D.C.2003).

right arm and shoulder as if hiding or retrieving something, *United States v. Page*, 298 A.2d 233 (D.C.1972).

We are not unheedful of Officer Norris's testimony that he may have been somewhat worried about his safety as he approached the driver's door and saw the movement around the dashboard. The trial court credited the officer's testimony that "this movement towards the dash area" was "inconsistent with anything that he had seen on a traffic stop"[3] and that it "gave him concern about his own safety and the fact that the defendant might be trying to retrieve a weapon." But we have to look at the particular facts and the extent to which they objectively indicate that Mr. Jackson was armed or reaching for a weapon. *See e.g., Page*, 298 A.2d at 234 (finding no objective evidence giving rise to reasonable suspicion despite officer's testimony that "it was obvious [Page] was trying to hide something" and that he was concerned for his safety); *Michigan v. Long*, 463 U.S. at 1050, 103 S.Ct. 3469 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). Notwithstanding the officer's testimony, the movement he described—"hands moving in the dash area"—did not give him particularized objective grounds for reasonably believing Mr. Jackson was moving his hands on the dashboard to retrieve a gun.

The importance of identifying a link between the nature of a particular gesture and a likelihood that the person making the gesture is armed was at issue in a D.C. Circuit case with marked similarities to the present case. *United States v. Spinner*, 475 F.3d 356 (D.C.Cir.2007), presented the question whether the police had reasonable suspicion to believe a man in a vehicle was armed based primarily upon the combination of his nervousness and a movement he made in which his body dipped toward the center console of the vehicle as if he were trying to get something or conceal something.[4] *Id.* at 359. The court stated that it could "not see how the officers' safety was implicated at all" by conduct in which Spinner "fiddl[ed] with the center console," got out of the vehicle, left the door open, and acted nervous when police sought his consent to search the vehicle. *Id.* at 359. In the court's view, there was "a logical gap between those facts—which support only the inference that Spinner may have put something (perhaps contraband) in his truck—and the conclusion that the police were 'dealing with an armed and dangerous individual.'" *Id.* (quoting *United States v. Holmes*, 385 F.3d 786, 789 (D.C.Cir.2004)). "Some additional fact is needed to get from the defendant's conduct (or his nervousness) to his likely being dangerous." *Id.*

3. Although the officer testified that the motion he observed was "something [he] hadn't seen before or that [he was] not used to seeing," he also stated that "a lot of people when they do a lot of movement around usually they start to place weapons or try to retrieve weapons or what have you."

4. The fuller view of what happened in *Spinner* was that police officers pulled into an alley in an area where there had been several recent drug arrests and saw Spinner walking toward a parked Chevy Tahoe. *Id.* at 357. Spinner opened the back driver's side door and got into the back seat, and when police told him he had to move the truck, "he kept eye contact but his body dipped, the right side of his body dipped towards the center of the back of the vehicle" and he appeared to be "struggling with something or trying to conceal something." *Id.* Spinner, who appeared nervous, denied having a weapon on him, consented to a frisk of his person, but denied consent to search the vehicle. *Id.* Believing that Spinner had placed something in the center console, police searched the area and found a handgun. *Id.*

The same is true here: there is a logical gap between Mr. Jackson's movement of his hands along the dashboard and the conclusion that police were confronting someone dangerous, and under our case law, "the ambiguous movement in this case cannot be the decisive fact justifying a frisk that was otherwise unwarranted." *Powell,* 649 A.2d at 1091 (Farrell, J., concurring); *see also Page,* 298 A.2d at 237 ("Furtive movements standing alone would hardly warrant a search[.]"). The overall calculus of factors in this case unquestionably varies from that in *Spinner,* and *Spinner*'s holding that the search there violated the Fourth Amendment by no means dictates a like conclusion here. *See Nixon v. United States,* 402 A.2d 816, 819 (D.C.1979) (noting that "we are to be guided by reasonableness and are not to be entangled in attempts to microscopically align the facts of the case at bar with those of prior cases having inevitably differing factual circumstances"); *In re D.E.W.,* 612 A.2d at 198 (stating that the determination whether a furtive gesture "would warrant a man of reasonable caution in the belief that the action taken was appropriate is case specific") (citation and internal quotation marks omitted). Yet our view that the predominant factor in the trial court's analysis in this case suffers from the same flaw as the gesture at issue in *Spinner*—namely, that it lacked specific indicia that it had something to do with grabbing or concealing a weapon—nevertheless becomes dispositive where the additional circumstances do not "reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469 (citation and internal quotation marks omitted).

██ Officer Norris's observation that the van was rocking when he pulled it over was the other factor besides the movement of Mr. Jackson's hands on the dash that the trial court mentioned as having height-ened the officer's suspicion. It was undoubtedly no everyday occurrence for the officer to see a van "begin to rock and shake" as he pulled his cruiser up behind it, and as the trial court found, these facts would have raised, and did raise, Officer Norris's suspicions. Officer Norris testified, however, that it was "obvious" to him right when he approached the van that the two occupants had traded places, and that Tyrone Jackson was "pretty forthcoming" in admitting they had. *See Anderson v. United States,* 658 A.2d 1036, 1038 (D.C. 1995) (stating that "a person's reaction to questioning" is a consideration in the reasonable suspicion analysis); *cf. Terry v. Ohio,* 392 U.S. at 28, 88 S.Ct. 1868 (noting that nothing in the suspects' responses to an officer's asking them their name served to dispel the officers' reasonable fear that they were armed). The officer did not claim that this particular conduct gave him reason to think the occupants were armed, and his quick grasp of what had actually happened resolved any lingering confusion and presumably defused his suspicion in that regard. While an evaluation of reasonable suspicion "need not rule out the possibility of innocent conduct," *Arvizu,* 534 U.S. at 277, 122 S.Ct. 744—or nondangerous conduct, if not wholly innocent—we cannot ignore the reality that Officer Norris's concerns about the rocking van were largely dispelled when he immediately saw that the occupants had switched places and understood why the van had been rocking. Given these circumstances, and given that there is nothing about people switching places in a car that inherently suggests these people are armed and dangerous, we do not view this factor as meaningfully reinforcing the lawfulness of the search for weapons under *Terry.*

Having concluded that the two factors upon which the trial judge primarily relied did not give rise to the officers' reasonable articulable suspicion, we next consider the

extent to which other factors may have justified the search given the totality of the circumstances. That the van's windows were tinted, for example, is an obvious consideration in the assessment of reasonable suspicion in this case. In its brief the government quotes the oft-cited language from the Fourth Circuit's decision in *United States v. Stanfield*, 109 F.3d 976 (4th Cir.1997): "[W]e can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows." *Id.* at 981. In this case, the trial court did not identify the tinting as a factor supporting its determination that there was reasonable articulable suspicion, presumably because of the abundant evidence that the vehicle's interior, unlike that in *Stanfield*, was *not* "entirely hidden" from Officer Norris's view and because of the lack of specific evidence that the tinting played much of a role in generating suspicion, actual or reasonable.[5] The "pretty fair lighting" of a streetlight was illuminating the scene of the stop and the officer's flashlight aided his view of things. When he was asked, "[W]hen was the first time you were able to see inside the van as you're walking up to it," he responded, "When I approached the driver side door, sir." Although the officer repeatedly stated that he could not see into the van's *rear* window when he first pulled the van over, he made clear that once he got to Mr. Jackson's door, he "was able to see his hands" and he "could see the movement along the dash area."

It is beyond question that police officers face untold dangers when they conduct traffic stops. Our task, however, is to evaluate the individualized articulable facts supporting reasonable suspicion in this case, and we would fail in that task if we were to quote *Stanfield*'s unbridled language and perfunctorily conclude that the van's window tinting gave rise to reasonable suspicion in this case without checking that impulse against the facts of this case. As noted above, the testimony at the hearing suggested that Officer Norris's suspicion was not exacerbated by the window tinting.

It is worth noting that even if the window tinting would have supported a reasonably prudent officer's belief that he was dealing with an armed suspect, here Officer Norris did exactly what the *Stanfield* court authorized police to do to nullify the risk whenever officers approach a vehicle with "windows so heavily tinted that they are unable to view the interior of the stopped vehicle." *Stanfield*, 109 F.3d at 981. That is, they may "open at least one of the vehicle's doors and, without crossing the plane of the vehicle, visually inspect its interior," *id.*—something the *Stanfield* court acknowledged "obviously ... interfered less with Stanfield's privacy interest than would have a complete search of the vehicle's interior permitted under *Long*," *id.* at 988. Though Officer Norris took this step and opened the driver's door, the facts of this case do not establish that the tinting was a meaningful factor justifying his decision not only to open the door, but to "cross[ ] the plane" of the van and conduct a *Terry* search of the vehicle's interior.[6]

---

5. The government also did not rely greatly upon the window tinting in support of its contention at the suppression hearing that the search was justified by reasonable suspicion. The "specific articulable facts" that the prosecutor highlighted as justifying a "limited protective search" of the vehicle were "mainly the rocking motions inside the vehicle, the

sudden switched positions of people in the car and then this frantic moving of the hands around the area where the drugs were ultimately found."

6. The court in *Stanfield* also explicitly acknowledged that people can sometimes see through even heavily tinted windows depend-

Officer Norris's testimony confirmed the existence of several other circumstances that are the kind of facts often relevant to an officer's suspicion that a person is dangerous. The stop occurred at night—shortly before 11 p.m.—not far from an area where Officer Norris had arrested people for drug crimes. When the trial court interrupted the prosecutor's questioning to ask whether it was a "high-drug area of the city," Officer Norris said yes. The officer also testified that Mr. Jackson was acting nervous and his heart was beating hard when the officer frisked him for weapons.

■ That a stop occurred in a high crime neighborhood is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). So is "nervous, evasive behavior," *id.* at 124, 120 S.Ct. 673, and the lateness of the hour at which the stop occurred, *Umanzor v. United States*, 803 A.2d 983, 993–94 (D.C.2002). The trial court reiterated this evidence in its findings but did not specifically rely on these factors in ruling that the police had reasonable suspicion to believe Mr. Jackson was dangerous. Considered in light of "the whole picture" of this case, *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), we do not find these facts sufficiently remarkable to justify the search of the van. "Although furtive movements of a suspect when combined with other significant factors may warrant further investigation or

even a search," we discern "very few articulable facts here" indicating that the occupants of the van might gain immediate control of weapons. *See Tyler v. United States*, 302 A.2d 748, 749 (D.C.1973) (citation and internal quotation marks omitted).

The stop in this case lacked many of the hallmarks of a particularly dangerous situation. The offense for which the officer stopped the van—illegal window tinting—was a minor one that prompted Officer Nelson to give Mr. Jackson only a verbal warning and to explain the law to him. *See, e.g., Powell*, 649 A.2d at 1089 ("[A] routine traffic violation, coupled with a slight hesitance on the part of the motorist does not establish reasonable suspicion that a person is armed and dangerous."); *Powell*, 649 A.2d at 1091 (Farrell, J., concurring) (the absence of evidence of "some graver offense" than a traffic violation undercut argument that appellant's bending or reaching movement created reasonable suspicion). From the outset and throughout the incident, the occupants of the car cooperated with the police. The van pulled over promptly at the first indication of a stop. *Cf. James*, 829 A.2d at 969 (noting that "appellant further aroused suspicion by failing to stop and pull over immediately when the officer turned on his emergency lights."). When Officer Norris opened the door Mr. Jackson held his hands in his lap, empty and visible to the officer.[7] He complied when the officer ordered him out of the van, quickly acknowledged that he and the female passen-

---

ing upon the available light at the particular location—and the facts of this case may be an example of that phenomenon. Specifically, as part of its contention that the defendant's privacy interests in the interior of his car were minimal, the *Stanfield* court emphasized the "undisputed evidence" before the court that "Stanfield's tinted windows would not have prevented passersby from viewing the [vehicle's] interior under all lighting conditions." *Id.* at 987–88. In the court's view,

"it was only because of the mere happenstance of cloud cover that the back seat of Stanfield's car was not visible." *Id.* at 988.

7. *See Powell*, 649 A.2d at 1091 (Farrell, J., concurring) (according significance to the fact that by the time police ordered appellant out of the car to conduct a *Terry* frisk, "his hands were visible to them" as he handed over registration documents).

ger had switched seats, "didn't have a problem with" letting the officer pat him down for weapons, and cooperated when the officer handcuffed him and placed him in the back of the cruiser. Before police ever searched Mr. Jackson's van, they had already frisked him and found no weapon. *See Spinner*, 475 F.3d at 360 (finding it significant that before police searched Spinner's vehicle they "had already determined Spinner did not have anything dangerous on his person when they frisked him—with his consent"). As in *Spinner*, "the encounter should have ended" after police patted Mr. Jackson down. *Id.*

### III. Conclusion

We hold that the totality of the circumstances in this case does not establish reasonable articulable suspicion to believe Mr. Jackson was armed and dangerous.[8] We therefore reverse the trial court's denial of Mr. Jackson's suppression motion and remand for further proceedings.

Dissenting opinion by Senior Judge BELSON.

BELSON, Senior Judge, dissenting:

This case raises troubling issues regarding measures a police officer may take to protect his or her life and safety during a traffic stop. We recognize in considering this issue that no matter how laudable the goal of any law enforcement effort may be, it must be conducted in a manner consistent with the liberties of our people guaranteed by the Constitution. I disagree with the majority opinion's analysis of whether the officer's conduct was "reason-

able" because the analysis gives too little weight to the safety and life of the investigating officer.[1]

A restatement of the facts will assist in understanding why appellant's conviction should be affirmed. At approximately 10:48 p.m., Officer Norris observed appellant's van turn in front of him in a "high-drug area" with which he was "[v]ery familiar." Officer Norris saw, through the front windshield, a female in the driver's seat and at the same time suspected that the van was operating with illegally tinted windows. The front driver's side window, as distinguished from the front windshield, was later found to be heavily tinted, to a degree illegal under the laws of both the District of Columbia and Maryland. That tinted window admitted only 20 percent of the ambient light, while under the law of the District of Columbia, the windows were required to transmit 70 percent, and under the laws of Maryland 35 percent, of the ambient light. *See* D.C.Code § 50–2207.02 (2001) *formerly* D.C.Code § 40–718.1 (1981); M.D.Code Ann., Transp. § 22–406(i) (West 2012). The relative opacity of the vehicle's windows significantly affected the ensuing investigation.

Officer Norris activated his emergency lights, the van stopped, and Officer Norris pulled up behind it. As Officer Norris began to run the van's plates, "the van began to rock, [and] there was a lot of shaking with[in] the van." Officer Norris could not see inside the van through its back window, and for that reason immediately approached to investigate. Officer

---

8. Because we conclude that the search was invalid on the ground that police lacked reasonable suspicion to believe the vehicle's occupants were dangerous, we need not reach Mr. Jackson's alternative challenges to the search—first, that it ran afoul of *Arizona v. Gant* because Mr. Jackson was handcuffed in the back of a police cruiser and presented no danger to police at the time of the search, and

second, that it was invalid because it exceeded the allowable scope of a search for weapons.

1. I do not suggest that my colleagues intend to undervalue this factor, but I point out that such undervaluation inheres in the majority opinion's analysis.

Norris had been a United States Park Police Officer for three years and had made over 1500 traffic stops for tinted window violations alone.

As he walked toward the van, Officer Norris was able to see a male in the driver's seat, whom he identified at trial as appellant. Officer Norris used his flashlight to see inside the car and at that point it appeared "obvious" to Officer Norris that appellant had switched seats with the female driver. Officer Norris shined his flashlight through the driver's side window, and saw "a lot of movement" within the front dashboard and console area. Because of the window's tint, Officer Norris could only "see [appellant's] hands moving in the dash area" and "a commotion going on." "With the window tint being what they were," he could not see the "exact spot" where appellant was placing his hands, nor could he see the "steering wheel area" well enough to determine whether appellant's hands were in that area. Officer Norris testified that appellant's movements in "the front driver's compartment area was something [he] hadn't seen before [and was] not us[ed] to seeing," unlike the typical movements to obtain a driver's license or registration. In Officer Norris's experience, "a lot of people when they do a lot of movement around usually they start to place weapons or they retrieve weapons ..." Officer Norris said his "issue was weapon and get [appellant] out of his comfort zone for my safety."

Concerned as he was that appellant might have a weapon, Officer Norris "immediately opened the [driver's side] door" to find appellant's hands were at "the bottom part of the steering wheel," where Officer Norris had been unable to see through the tinted windows. Officer Norris twice asked appellant what he was doing, one time specifically asking "what did you just do, what did you just put right

there?" Appellant responded, "nothing." Officer Norris explained that he opened appellant's door to "see what was going on" and to "see what [appellant had] in his hands." Officer Norris reasoned that he "wasn't gonna give [appellant] enough time to get out a weapon, load it and point it at [him]." Therefore, Officer Norris ordered appellant out of the van.

Officer Norris told appellant that he had seen the female driving, and asked him why they switched seats. It was only then that appellant admitted that the female had been driving, and told Officer Norris that she did not have a driver's license. Appellant then consented to a pat-down of his body for weapons, and none were found. During the pat-down, Officer Norris observed appellant had a "nervous demeanor," felt his heart beat quickly, and noticed his heavy breathing.

After the pat-down, Officer Norris handcuffed appellant and "detained" him in the police cruiser, but informed him that he was not under arrest. Officer Norris explained that he did so "for [his] safety, not knowing what they had or what was going on" and because he was initially the only officer at the scene. Officer William Alton then arrived at the scene to assist. He secured the female passenger by removing her from the van and having her sit, handcuffed, on the sidewalk. Officer Norris then stood with the female passenger, and directed Officer Alton to check the front passenger compartment "just to make sure there [were] no weapons there." As Officer Alton was looking around the front part of the van, he noticed that the van's horn cover appeared removable. It was "dispositioned" and looked like it had been "shifted." Officer Alton removed the horn cover, which came up quite easily, and in the airbag compartment beneath it found three large Ziploc bags, two of which con-

tained a total of forty individually packaged ziploc bags of cocaine.

After Officer Norris placed appellant under arrest for, among other things, possession with intent to distribute cocaine, he measured the tint of the van's front windows with a tint meter. As explained above, the reading was 20 percent. He also determined that the van's registration had expired. Officer Norris gave appellant a verbal warning about the tint after he was arrested for the registration violation. Officer Norris explained at the hearing that, although appellant was subject to arrest, and in fact was arrested, for driving an unregistered vehicle, driving an automobile with illegally tinted windows did not furnish grounds to arrest. Therefore, until he ascertained that the registration had expired, he lacked a basis to arrest appellant.

Officer Norris was the only witness to testify. The trial court credited his testimony that he saw the van "shaking back and forth" when it stopped. The trial court further credited the officer's testimony that, upon walking to the van, he noticed that appellant had switched seats with the female driver, which the trial court concluded "certainly could heighten [Officer Norris'] suspicion." Additionally, the court credited Officer Norris' testimony that he saw movement in the dash area. Finally, the trial court credited Officer Norris' testimony that the movement was "inconsistent with anything that he had seen on a traffic stop," and that the movement "gave him concern about his own safety and the fact that [appellant] might be trying to retrieve a weapon." [2] The trial court concluded that Officer Norris had a "reasonable articulable suspicion

that [appellant] might be hiding or trying to retrieve [a weapon]." [3]

The trial court determined that the controlling precedent for this case is *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), and rejected appellant's arguments that this case falls under *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The trial court accordingly found that the officer "had the right to conduct a limited search [for weapons] of the areas that appellant could reach." The trial court reasoned that there was "a very distinct possibility" that appellant would return to the car after the investigatory stop and regain access to a weapon. The court found, moreover, that the horn cover was "immediately in front of the dash" and "about as reachable [in proximity to appellant] as you can possibly get." The trial court concluded that Officer Norris was "entitled to do the search," and that the search was "reasonable" under *Long*.

I disagree with the majority that the foregoing facts, viewed in their totality, did not afford Officer Norris a reasonable and articulable basis to search (or "frisk") the passenger compartment of appellant's van for weapons. Therefore, appellant's convictions should be affirmed.

### A.

Appellant argues that "the only basis for finding that Mr. Jackson was dangerous was the so-called 'furtive movements.' The trial court thus erred in finding that Officer Norris had a reasonable suspicion to believe that Mr. Johnson was dangerous." To the contrary, the record supports the trial court's ruling that the totality of the circumstances gave Officer Norris a reasonable articulable suspicion

---

**2.** The trial court did not indicate that there was any aspect of the officer's testimony that it discredited.

**3.** The trial court initially said "contraband," not "weapon," but later stated that the officer was "clearly searching [for] a weapon."

that appellant was trying to hide or retrieve a weapon, and therefore gave him adequate reason to conduct a protective search of the van's passenger compartment.

Instead of engaging in "library analysis by scholars," *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), we are charged with viewing the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Peay v. United States,* 597 A.2d 1318, 1322 (D.C.1991) (en banc) (citation omitted). The Supreme Court's "cases have recognized that a police officer may draw upon inferences based on his own experience in deciding whether probable cause exists." *Ornelas v. United States,* 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citation omitted). "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 699, 116 S.Ct. 1657. "The [trial] court's legal conclusions on Fourth Amendment issues ... 'are subject to *de novo* review.' " *Joseph v. United States,* 926 A.2d 1156, 1160 (D.C.2007) (quoting *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991)). In conducting our review, however, "[w]e must defer to the [trial] court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling [of the trial court]." *Id.* Here we review a ruling that the officer had reasonable articulable suspicion, that is, "more than a mere 'hunch' or 'gut feeling' " but "substantially less than probable cause" to believe that appellant was attempting to hide or retrieve a weapon. *Bennett v. United States,* 26 A.3d 745, 751 (2011) (quoting *James v. United States,* 829 A.2d 963, 966 (D.C.2003) (citation and internal quotation marks omitted)).

When Officer Norris stopped appellant's van late at night, it was being operated with deeply and illegally tinted windows in a "high drug" area. When the van pulled over, Officer Norris immediately saw it rock and shake abnormally. As Officer Norris approached the van, he realized that appellant had switched seats with the female passenger, whom he had earlier observed driving the vehicle.[4] With the help of a flashlight, Officer Norris was able to observe, through the van's illegally tinted windows, appellant making a "commotion" and moving his hands around the dash area. "[T]he continuous motion that [Officer Norris] saw that was going on in ... the front driver's compartment was something [he] had not seen before or that [he was] not us[ed] to seeing." However, because of the window's tint, Officer Norris could not see the "exact spot" where appellant was placing his hands, nor could he see the "steering wheel area" well enough to determine whether appellant's hands were in that area. Officer Norris immediately opened the driver's side door to find appellant's hands near "the bottom part of the steering wheel," where Officer Norris had been unable to see through the tinted windows. When Officer Norris twice asked appellant, "what did you just do, what did you just put there?", appellant suspiciously and untruthfully responded, "nothing." Throughout the stop, appellant exhibited a "nervous demeanor." Officer Norris also noticed how hard appellant's heart was beating and that appel-

---

4. The majority opinion states that appellant's admission that he and the female passenger switched seats and the officer's quick grasp of what happened "presumably defused his suspicion." The testimony of Officer Norris concerning his suspicion about appellant's behavior is entirely inconsistent with that presumption.

lant was breathing heavily during the pat-down. Based on the totality of these circumstances, it was reasonable for Officer Norris to order a protective search of the van's passenger compartment before allowing appellant to return to the vehicle and be in a position to retrieve any weapon. *See Long, supra,* 463 U.S. at 1050, 103 S.Ct. 3469 (listing that "the hour was late" as one circumstance justifying officers' "reasonable belief that [the defendant] posed a danger"); *United States v. Glover,* 851 A.2d 473, 477 (D.C.2004) (noting defendant's "nervousness" as relevant factor, and remanding for clarification of whether defendant's reaching motion, in addition to nervousness, justified search of defendant's vehicle for weapons); *James, supra,* 829 A.2d at 968 (holding "high crime area" relevant to reasonable suspicion analysis); *Anderson v. United States,* 658 A.2d 1036, 1038 (D.C.1995) (stating that "a person's reaction to questioning" is a consideration of the reasonable suspicion analysis).[5]

The majority concludes that, "notwithstanding the officer's testimony, the movement he described—'hands moving in the dash area'—did not give him particularized objective grounds for believing [appellant] was moving his hands on the dashboard to retrieve a gun." The majority's analysis is skewed. It does not give adequate weight to the perception of the experienced police officer that the unusual and continuous motion of the appellant's hands could have indicated that he was trying to hide or retrieve something, possibly a weapon.

Furthermore, it discounts the fact that the motion was partially obscured by the illegally tinted windows, does not consider the availability of various compartments, recesses, or alcoves commonly available to hide weapons in the front compartment of vehicles, and gives little weight to the lateness of the hour or the high drug area in which the events occurred. As developed here, a full consideration of the totality of the circumstances should result in affirmance.

I also disagree with the approach taken by the majority opinion in analyzing appellant's movements and role of tinted window in reasonable suspicion analysis. The majority's analysis of the reasonableness of the officer's actions is unduly restrictive. Although it recognizes, as it must, that the totality of the circumstances may differ in every case and other factors may tip the balance regardless of the nature of the particular gestures in a given case, the analysis relies heavily on the proposition that "our decisions involving so-called furtive gestures have generally drawn a distinction between conspicuous reaches under the seat and less distinct bending motions or movements toward the dash, the console or the passenger seat." The opinion goes on to cite three cases in which this court (or the D.C. Circuit) has found a gesture to give rise to a reasonable suspicion, in all of which a suspect is seen reaching down and appearing to place something under the seat.[6]

**5.** Appellant cites *Tyler v. United States,* 302 A.2d 748 (D.C.1973) and *United States v. Page,* 298 A.2d 233 (D.C.1972) to support his proposition that his furtive gestures *alone* did not "give[1] rise to a finding of reasonable suspicion justifying a search of a vehicle compartment." While furtive gestures alone will not normally justify a search, Officer Norris's search was based on a reasonable articulable suspicion that appellant might be armed and dangerous based on not only furtive gestures but the totality of the circumstances.

**6.** *James v. United States, supra,* 829 A.2d 963; *McGee v. United States,* 270 A.2d 348 (D.C. 1970); *United States v. Green,* 465 F.2d 620 (D.C.Cir.1972). On this point the opinion also cites *In re D.E.W.,* 612 A.2d 194, 195 (D.C.1992), a case that does not involve the search of a car, but rather the search of a person who acted suspiciously while seated in a car, and thus is not relevant to this case.

Given the wide variety of vehicles that travel our streets and the numerous hiding places that may be found in their passenger compartments, especially in the front area around the dashboard, it would not be appropriate for us to substitute our judgment for that of an experienced police officer who sees hurried, continuous, and unnecessary hand motions in the dashboard area and believes that a suspect is doing precisely what the appellant here was almost certainly doing: hiding an object in a compartment where he hoped it would escape detection. Appellant's compartment of choice was the empty airbag space beneath the horn, an area large enough to hold three large Ziploc bags, two of which contained a total of 40 smaller Ziploc bags that contained cocaine.

While the record does not set forth the size of the particular compartment appellant used, the photograph included in the record makes it appear sufficiently capacious to hold at least a small firearm. In a recent case, not involving suppression, decided by the D.C. Circuit, "the agents found a semi-automatic pistol loaded with fifteen rounds of ammunition hidden near the car's steering wheel, as well as a bag containing $4,037 in cash." *United States v. Dozier,* 162 F.3d 120, 121 (1998). Many other cases identify hiding places in the front of a vehicle other than the space beneath the front seat. Although most of these cases do not involve suppression issues, they illustrate the wide variety of locations within vehicles where weapons have been hidden. *See e.g. United States v. Beard,* 354 F.3d 691, 692 (7th Cir.2004) (during search of car, police found "a loaded derringer in the closed center console of the front seat, hidden under some papers"); *United States v. Cherry,* 8 Fed. Appx. 420, 421 (6th Cir.2001) ("Hidden under a plastic cover at approximately the point where the steering column emerged through the dash, officers uncovered a small semi-automatic pistol containing six rounds of .380 caliber ammunition."); *United States v. Taylor,* 162 F.3d 12, 17 (1st Cir.1998) (with probable cause to search for narcotics, an officer "looked into the driver's side area of the sunroof compartment and found a ski cap wrapped around a loaded .45 caliber automatic pistol with an extra ammunition clip"); *United States v. Sample,* 136 F.3d 562, 563 (8th Cir.1998) (handguns found behind detachable dashboard); *United States v. Cardenas,* 864 F.2d 1528, 1530 (10th Cir.1989) (during inventory search, officer located a ".25 caliber handgun behind a potato chip bag in an open dashboard compartment on the driver's side of the car; the open compartment was inches from the steering wheel, within an effortless reach of [the defendant]"); *Delatorre v. State,* 903 N.E.2d 506, 507 (Ind.Ct.App.2009) (gun in the compartment of the driver's side door); *People v. Sandoval,* No. B198105, 2008 WL 638391, at *1 (Cal.Ct.App. Mar. 11, 2008) (unpublished), *review denied* May 21, 2008 (searching vehicle with the defendant's consent, officers "discovered a compartment at the base of the steering column" which held, inter alia, drugs and "a loaded handgun"); *Robinson v. State,* 22 S.W.3d 631, 634 (Tex.App.2000) (after traffic stop, officer observed drugs in the car; later search of "the console of the car" which "had a compartment below the gearshift" revealed "two guns" and "crack cocaine"); *State v. Nebbitt,* 713 S.W.2d 49, 50 (Mo.Ct. App.1986) (after observing defendant appearing to hide something, officer pulled "a piece of felt with a cardboard backing hanging down from under the glove compartment" and "a loaded pistol fell to the floor." Subsequent search, "which included removing a section of the dashboard, revealed two other loaded pistols"); *Roy v. State,* 552 S.W.2d 827, 829 (Tex.Crim.App. 1977), partially overruled on non-search related grounds by *Johnson v. State,* 650 S.W.2d 414 (Tex.Crim.App.1983) (after ar-

resting man who falsely claimed to be a "deputy constable," officer "conducted an inventory of the pickup and discovered a loaded .38 calibre [*sic*] revolver in the side compartment of the left door"). A police officer approaching a stopped automobile late at night, especially where, as here, the vehicle has deeply tinted windows, is in as much danger from a gun hidden in an air bag compartment or another compartment in or near the dash as from a weapon hidden beneath the front seat.

In addition, the majority opinion does not give adequate weight to the role that the illegally tinted windows played in this traffic stop. Illegally tinted windows obscure the occupants of a vehicle and their movements. Courts have taken notice of the fact that these windows conceal threats to officer safety and therefore can heighten an officer's reasonable suspicion. For example, Judge Garland of the D.C. Circuit observed in a case before that court where "the windows of the black Cadillac were darkly tinted preventing the officers from having a clear view of the car's occupants," that "[t]his fact magnified the danger of approaching unknown individuals inside an automobile." *United States v. Brown*, 334 F.3d 1161, 1169 (D.C.Cir.2003). The court went on to note that "the tinting made it impossible to know whether one of the occupants was reaching for a weapon ... or otherwise acting to endanger the officers' safety." *Id.*

A recent Pennsylvania decision regarding facts remarkably similar to those before us also illustrates this point. In *Commonwealth v. Murray*, 936 A.2d 76 (Pa.Super.Ct.2007), the appellate court reviewed the denial of a motion to suppress a Glock .40 caliber handgun found in the armrest immediately to appellant's right and seized after appellant's vehicle was stopped at night in "a high narcotics area." *Id.* at 79. "Due to the tinted windows, [the officer] could not 'actually see

what [appellant] was doing' but was able to discern 'a lot of movement in the vehicle.'" *Id.* (internal citation omitted). The court held that the officer had "articulated sufficient facts to lead him to properly conclude that [appellant] could have been armed and dangerous." *Id.* at 80. "Specifically, the knowledge of the neighborhood being a well-known narcotics area, when coupled with the excessive movement inside the vehicle and hour of night, raised serious and obvious safety concerns that justified a search for weapons." *Id.* (citations omitted). The foregoing language describes the case before us almost precisely—but for the additionally suspicious conduct element here of the unusual rocking of the van after Officer Norris pulled it over. The court should reach the same result in this case as did the *Murray* court on virtually identical facts.

As this court recognized in *United States v. Mason*, 450 A.2d 464, 466 (D.C. 1982), "[t]he protection of the officer making the stop and of innocent bystanders, is of paramount importance. It has been called the rationale of *Terry*." (citations omitted). The Supreme Court has recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, supra, 463 U.S. at 1047, 103 S.Ct. 3469. While our opinions may deal in the abstract concerning danger to officers approaching a stopped vehicle, the realities on the street are harsh. From 2001 through 2010, 62 law enforcement officers were feloniously killed in this country during traffic stops. Thirty-three of these killings took the lives of officers as they were "approaching offenders," 12 while the officers were still in the patrol unit, 8 while they were interviewing offenders at the offender's vehicle, 3 outside the offender's vehicle, and the balance during other aspects of the investigation at the scene of the stopped vehicle. Federal Bureau of Investigation, Uniform Crime

Report, Law Enforcement Officers Killed or Assaulted 2010, Table 20 (released Oct. 2011). In the year 2010 alone, 4,752 officers were assaulted in connection with "traffic pursuits/stops" including 208 assaulted by firearm, 35 by knife or other cutting instrument, and 1,592 by other dangerous weapon. *Id.* at Table 73. Although danger to police officers does not give them the authority to disregard the Constitution, it can be a factor in an experienced officer's judgment as to whether there is a reasonable basis to search a vehicle.

The majority opinion recognizes that "it is beyond question that police officers face untold dangers when they conduct traffic stops." It goes on to warn against "perfunctorily conclud[ing] that the van's window tinting gave rise to reasonable suspicion without checking that impulse against the facts of this case." Precisely so. It is on the basis of all the relevant facts, realistically evaluated and seen through the eyes of the experienced officer on the scene, that the search of the appellant's vehicle, and in particular the area near his unusual and continuous hand movement,

should be evaluated. It is unrealistic to discount, to any degree, either the danger to an investigating officer, or the officer's ability to perceive that what is going on behind the tinted windows is unusual and warrants great caution, merely because there is no "conspicuous reach under the seat." [7]

Upon considering the deference we should give to the officer's appraisal of the significance of the unusual and continued movements of the appellant's hands as the officer approached, the availability of hiding places for weapons in the dash area of a vehicle, the danger to the safety of the officer as he approached a vehicle with deeply and illegally tinted windows and the prescription that "[i]n reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling," *Peay, supra,* 597 A.2d at 1320, the judgment on appeal should be affirmed.[8]

**B.**

As I would affirm, I must address appellant's argument that even if reasonable

7. The majority opinion places considerable reliance on *United States v. Spinner,* 475 F.3d 356 (D.C.Cir.2007), stating that it "presented the question whether the police had a reasonable suspicion to believe a man in a vehicle was armed based primarily upon the combination of his nervousness and a movement he made in which his body dipped toward the center console of the vehicle as if he were trying to get or conceal something." The facts in *Spinner* are so dissimilar to those before us that the opinion provides no guidance. Two officers, rather than one as here, approached a parked vehicle after seeing Spinner walk up to it and sit in the back seat. There was no indication that the police were looking through tinted windows, or that the events occurred at night. Spinner's motions were clearly visible to the two officers and gave at most an equivocal indication that he might be dangerous and might gain immediate control of a weapon.

8. The Supreme Court has stated that *de novo* review by appellate courts of cases involving reasonable suspicion and probable cause "tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules'" to enable them to determine in advance whether an invasion of privacy is justified. *Ornelas, supra,* 517 U.S. at 697, 116 S.Ct. 1657 (quoting *New York v. Belton,* 453 U.S. 454, 458, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)). The majority opinion's narrow view of what an officer may reasonably do in circumstances like those before us can be expected to influence police training and conduct in connection with situations where police officers making a traffic stop perceive that they are in danger, and to do so in a way that will cause officers to forgo searches that they consider reasonable.

articulable suspicion existed, the search was impermissible under *Gant* because appellant was secured and unable to access the van at the time of the search. Under the circumstances present here, however, appellant would eventually have been allowed to return to the van if he was not arrested. At the time of the "frisk" of the van the police did not have grounds for arrest. Upon his return to the car, he could have then retrieved a weapon from the vehicle, a circumstance that posed a serious threat to Officer Norris. For this reason, Norris was permitted to order a search of the van's passenger compartment.

*Gant* held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant, supra,* 556 U.S. at 351, 129 S.Ct. 1710. *Gant,* however, did not change the law applicable to protective searches under *Terry* and *Long.* Indeed, the court noted in *Gant* "[o]ther established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand." *Id.* at 346, 129 S.Ct. 1710. The court specifically identified *Long* as an exception that "permits an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is dangerous and might access the vehicle to gain immediate control of weapons." *Id.* at 346, 129 S.Ct. 1710 (quotation marks and citations omitted); *see also id.* at 352, 129 S.Ct. 1710 (Scalia, J., concurring) ("Where no arrest is made ... officers may search the car if they reasonably believe 'the suspect is dangerous and ... may gain immediate control of weapons.'" (quoting *Long, supra,* 463 U.S. at 1049, 103 S.Ct. 3469)).

While appellant is correct that he was secured and "unable to access the van *at the time of the search,*" he would have eventually been allowed to return to the van, because the tint infraction was not an arrestable offense, and he could have then retrieved a weapon from the vehicle. Appellant nonetheless argues that focusing on the "detainee's formal arrest status rather than his secured status, provides police an outright invitation to evade *Gant*'s limits on their search powers because they can exercise their discretion to not arrest an individual where probable cause exists, place him in custody so as to deny him immediate access to the vehicle and thereupon search his vehicle." The point here is different. The police were not in a position to exercise discretion whether or not to arrest appellant. They had no basis on which to arrest him as of the time of the search: "[i]n the no-arrest case, the possibility of access to weapons in the vehicle *always* exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." *Id.* at 352, 129 S.Ct. 1710 (Scalia, J., concurring) (emphasis added).

This case remained a no-arrest case until the officer ran the vehicle's tag numbers after the *Terry* search of the vehicle. For those reasons, "the officers did not act unreasonably in taking preventive measures to ensure that there were no ... weapons within [appellant's] immediate grasp ..." *Long, supra,* 463 U.S. at 1051, 103 S.Ct. 3469; *see also United States v. Vinton,* 594 F.3d 14, 20 (D.C.Cir.2010) (declining to expand *Gant* to officer's initial protective search and noting that *Gant* specifically limited its holding to the search-incident-to-arrest context; finding that officer's safety concerns were not "abated by ordering [the defendant] out of the car and handcuffing him, because had [the defendant] ultimately not been arrested, he would have been 'permitted to reen-

ter his automobile, and he w[ould] then have [had] access to any weapons inside.'" (quoting *Long, supra,* 463 U.S. at 1052, 103 S.Ct. 3469)). This case, therefore, is not controlled by *Gant.*[9]

Accordingly, I would affirm the trial court's decision to deny appellant's motion to suppress and affirm the judgment on appeal.

---

**9.** Appellant also argues that "the search exceeded the scope permitted by *Long,*" because the investigating officer "spent several minutes searching [his] van before [the officer] found the cocaine" and the officer "effectively removed compartments from the interior of the van, including the steering wheel, before he found the cocaine." Appellant's argument is without merit. Here, the trial court credited the officer's testimony that appellant's steering-wheel horn cover appeared "dispositioned" and was easily removed. Moreover, the trial court received into evidence photographs showing the interior of appellant's van, including the open and closed sizable horn cover and the substantial air-bag compartment beneath it where the drugs were found. Using those photographs, the trial court found that the steering wheel was "immediately in front of the dash" (where appellant was observed moving his hands in a manner that was consistent with placing or retrieving a weapon) and "about as reachable [in proximity to appellant] as you can possibly get." It is of no consequence that the second officer on the scene did not focus immediately on the steering wheel area after Officer Norris told him to search the passenger area for weapons.