# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                 *Plaintiff-Appellee,*

           v.

ROBERT JAMES BURKETT,
                 *Defendant-Appellant.*

No. 09-30260

D.C. No.
3:08-cr-05548-
RBL-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Submitted May 3, 2010
Seattle, Washington

Filed July 20, 2010

Before: Cynthia Holcomb Hall, Kim McLane Wardlaw, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Hall

10355

## COUNSEL

Gregory A. Gruber, Assistant United States Attorney, Tacoma, Washington, for the plaintiff-appellee.

Ronald D. Ness, Port Orchard, Washington, for the defendant-appellant.

## OPINION

Judge HALL, Circuit Judge:

Robert James Burkett appeals from a judgment of conviction, after a bench trial, of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Burkett's sole contention on appeal is that the district court erred in denying his motion to suppress the automatic pistol found in his coat pocket during a pat-down search conducted by a Washington State Patrol trooper after an automobile in which Burkett was riding as a passenger was stopped for speeding. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

### I.

At approximately 1:00 a.m. on May 11, 2008, Washington State Patrol Trooper Benjamin Blankenship was on patrol on

Highway 12 in Grays Harbor County, Washington. In his rearview mirror, Trooper Blankenship observed the headlights of a car approaching at "a pretty good clip." Based on nearly twenty-two years of law enforcement experience, Trooper Blankenship believed that the car was traveling over the posted speed limit of 55 miles per hour. As a result, he activated his rear antenna radar which registered a speed of 67 miles per hour. Once he verified that reading with a second radar check, Trooper Blankenship pulled his patrol car behind the speeding vehicle, a Ford Taurus, turned on his emergency lights, and tried to effect a traffic stop.

The driver of the Taurus did not respond to Trooper Blankenship's emergency lights by pulling over to the side of the highway. Instead, the vehicle continued ahead at the same speed, eventually slowing to 40-45 mph, and then turned onto an exit ramp leading off the highway at Devonshire Road and came to a stop just past the top of the ramp. The Taurus traveled a total of eight-tenths of a mile after Trooper Blankenship turned on his emergency lights.

Because there were multiple safe places to pull over before that point, Trooper Blankenship considered this to be "an extremely long time" to respond, and he began to suspect that "something [was] not right." He used his spotlight to illuminate the passenger compartment of the car as it continued down the highway. He also took the unusual step of calling for another officer, Trooper Eisfeldt, to respond as backup since the Taurus had failed to respond to his emergency lights.

Once Trooper Blankenship turned on his spotlight, he could see a male passenger, later identified as Burkett, making "furtive movements" as the car continued to travel. Burkett leaned forward in his seat but kept his head rigid as if to make it appear that he was continuing to look forward and to disguise his movements. Nonetheless, the trooper could see the movement of Burkett's shoulders because the spotlight was reflect-

ing off the white jacket he was wearing. It appeared that Burkett was either hiding or retrieving something from underneath the seat, an observation that heightened Trooper Blankenship's concerns.

When the Taurus finally stopped, it was on Devonshire Road, a road with less traffic than Highway 12. At that point, Trooper Blankenship approached the driver's side, spoke with the female driver, and asked for her license and registration. At the same time, Trooper Blankenship used his flashlight to illuminate Burkett's hands because the movements he had observed and the failure of the car to stop caused him to believe Burkett presented the "biggest concern" if there was a weapon in the car. When Trooper Blankenship first walked up to the driver's door, Burkett's hands were in his lap, but they did not remain in that position, or even stay in the trooper's view. Trooper Blankenship observed that both the driver and Burkett appeared to be "unusually nervous."

Trooper Blankenship asked the driver if she knew how fast she was going, and then told her he had clocked the vehicle going 67 miles per hour. He asked Burkett what he was doing just before the car stopped, to which Burkett responded, "Nothing." Knowing this was untrue based on his own observations, Trooper Blankenship told Burkett he saw him place something under the seat. Burkett first appeared startled and then said something about having a drink, pointing out a cup of liquid on the "transmission hump" between the seats. Blankenship noted that the response appeared to be something that "just popped into [Burkett's] head" to explain his actions. Moreover, this statement did not appear to be true because it was not consistent with the movements the trooper saw before the car came to a stop. Burkett's movements were "more forward and under the seat, as opposed to his left and then down." Based on what he observed and Burkett's response, Trooper Blankenship suspected that Burkett might be armed. At that point, Trooper Blankenship asked for identification, which Burkett provided.

Because of his increasing safety concerns, Trooper Blankenship asked Burkett to get out of the car. However, rather than using the hand closest to the door, his right hand, to open it, Burkett made the "unusual movement" of reaching across his body and opening the door with his left hand, thereby blocking the officer's view of both of his hands with his body. Because this further heightened Trooper Blankenship's suspicions, he walked to the back of the car to reposition himself so he could see Burkett as he got out of the car.

Initially, Trooper Blankenship could not see Burkett's hands as he got out of the car. But then, as Burkett turned toward the back of the car and the trooper, "it appeared that he was reaching with his right hand trying to find [the] front coat pocket" of his white, knee-length jacket. Trooper Blankenship yelled for him to keep his hands out of his pocket and then stepped forward and grabbed Burkett by the right arm. He escorted Burkett to the back of the car where he had Burkett place his hands on the trunk and spread his feet. The trooper then began a pat-down search for weapons.

As the trooper started the pat-down search, Burkett "kind of turned his torso to the right and raised his right hand up off the trunk." Trooper Blankenship pushed Burkett's hand back onto the trunk and told him to keep his hands in place. Burkett then tried to move away two more times. It was at that point that Trooper Eisfeldt arrived at the scene. When Burkett noticed the arrival of the second officer, he said, "You've got me," and put his hands on the trunk lid. Burkett then acknowledged that he had a gun in his right jacket pocket. Trooper Blankenship retrieved the .380 automatic pistol from that pocket.

On redirect at the suppression hearing, Trooper Blankenship stated that he did not follow the usual practice of retrieving the driver's identification and returning to his car to radio the information to his dispatcher because, in the circumstances, his suspicions had been raised. He said that without

such suspicions he would not ordinarily call another trooper to the scene. Moreover, Trooper Blankenship stated that, by returning to his car and speaking on the radio, he would have placed himself into a vulnerable position unless he first addressed his suspicions that Burkett might be armed.

Burkett also testified at the suppression hearing, and gave an account of the events of the traffic stop that did not give rise to any serious dispute about the facts reported by Trooper Blankenship, only about the inferences to be drawn from them. Burkett claimed that when the officer's emergency lights came on behind the Taurus, he had an unopened 22-ounce beer in a paper bag on his lap. Burkett stated that he "leaned forward and set the beer on the ground" placing it against his leg. Burkett claimed that after initially denying any movement, he told Trooper Blankenship he was just putting the beer on the ground, and that he then picked up the beer to show it to the officer. Burkett admitted he showed an open cup of alcohol in the center console to Trooper Blankenship and then put it back where it had been. He also acknowledged that the officer asked for his identification, which he handed over, and that the officer then asked him to get out of the car. Burkett admitted he opened the passenger door with his left hand after "throwing the [seatbelt] strap over" his body with that same hand. Finally, Burkett said that because the passenger side of the car was close to the guardrail, and he was wearing a "big coat," he "had to kind of squeeze through the door and push [his] jacket out at the same time," offering this as an explanation for the movements Trooper Blankenship observed.

On cross-examination, Burkett admitted the car traveled a very long distance after the trooper turned on his emergency lights to direct the car to stop, and confirmed that the officer's spotlight came on after the driver said they were going to get stopped. Burkett said he put his beer on the floorboard after the spotlight came on and suggested that he told the officer he was not doing anything because he "thought it was a harmless

move to put my beer on the ground." Burkett acknowledged that the trooper told him he had observed the movement. Regarding the use of his left hand to open the door, Burkett suggested he did this because his left hand was already near the door after using it to release and manually retract his seatbelt. Burkett further acknowledged that his action of pushing his coat out the door as he exited the car could be perceived by Trooper Blankenship as if Burkett was moving his hand toward his pocket.

At the conclusion of the testimony, the district court rendered its decision on the record. The court noted that Burkett did not dispute that the Taurus was speeding, or that the driver of the car failed to stop for some time after the officer had activated his emergency lights. The district court found that the driver's decision to keep traveling, for whatever reason, heightened Trooper Blankenship's suspicions and caused him to use his spotlight. The court further noted that the defense did not challenge the fact that Burkett actually leaned forward while the trooper was attempting to stop the car. As a result, the officer's suspicions were further heightened to the extent that he called another trooper for assistance, an action that the court found to be reasonable under the circumstances. The district court also found that Burkett's answer that he did "nothing" in response to Trooper Blankenship's question, given what he had seen, provided the officer yet another reason to believe Burkett presented a threat. Finally, the district court observed that the testimony established that when Burkett got out of the car, his hand was near his coat pocket and that Trooper Blankenship was justified in believing that Burkett was reaching for the pocket.

Based on these facts, the district court concluded that Trooper Blankenship "had a reasonable belief or suspicion" that Burkett might be armed and dangerous. The district court noted that it was not difficult to reach the conclusion that Trooper Blankenship had cause to believe that Burkett might be armed and then dangerous and that this warranted the

trooper's actions. Accordingly, the district court denied Burkett's motion to suppress.

## II.

We review de novo the district court's denial of Burkett's suppression motion. *United States v. Johnson*, 581 F.3d 994, 998 (9th Cir. 2009). A determination whether there was reasonable suspicion to support an investigatory "stop and frisk" is a mixed question of law and fact, also reviewed de novo. *Id*.

## III.

Burkett does not dispute that Trooper Blankenship had reasonable suspicion to stop the vehicle in which he was riding as a passenger, as it was traveling at a speed of 12 miles over the posted speed limit. Rather, he contends that the evidence presented at the suppression hearing does not support the district court's ruling that Trooper Blankenship had reasonable suspicion to believe he was armed and dangerous.

[1] Law enforcement officers may lawfully conduct a "frisk" or "pat-down search" of a passenger during a lawful investigatory "stop" if the officer reasonably suspects the passenger is armed and dangerous. *Arizona v. Johnson*, ___ U.S. ___, ___, 129 S.Ct. 781, 784, 787 (2009); *Knowles v. Iowa*, 525 U.S. 113, 117-118 (1998); *Terry v. Ohio*, 392 U.S. 1, 23-24 (1968). To determine whether reasonable suspicion existed, we consider the "totality of the circumstances surrounding the stop." *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992). "Reasonable suspicion 'is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.' " *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (quoting *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000)). The determination is made with reference to

the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *Hall*, 974 F.2d at 1204 (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).

**[2]** Contrary to Burkett's argument that the seizure of the firearm from his coat pocket stemmed from a violation of his Fourth Amendment rights, the record developed during the suppression hearing amply supports a conclusion that the "stop and frisk" in this case was reasonable. In the totality of the circumstances, the highly experienced State Trooper had good reason to suspect that Burkett was armed and dangerous, and that a pat-down search was necessary to ensure the officer's safety. Objectively viewed, Burkett's furtive movements during the time the driver was refusing to comply with the order to stop her vehicle, his evasive and deceptive responses when asked what he was doing at that time, the peculiar way he opened the door with his left hand, and the way he kept his right hand near and reached for his right coat pocket when he got out of the vehicle, would justify an experienced law enforcement officer's belief that Burkett was armed and dangerous. Whether or not Burkett's "innocent" explanations for his conduct were true, the district court did not err in concluding that the officer's observations provided an objectively reasonable basis for suspecting that Burkett had a weapon.

## IV.

For the foregoing reasons, the judgment of conviction, including the sentence imposed, is AFFIRMED.