*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1128

JUWAN CHAMPION, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF2-000808)

(Hon. Danya A. Dayson, Trial Judge)
(Hon. Juliet J. McKenna, Motions Judge)

(Argued October 14, 2020                    Decided January 4, 2024)

*Robin M. Earnest*, appointed by this court, for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Julia Cosans*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, *and* GLICKMAN,[*] *Senior Judge*

---

[*] Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

Opinion for the court by *Associate Judge* Beckwith.

Dissenting Opinion by *Senior Judge* Glickman at page 22.

BECKWITH, *Associate Judge*: Appellant Juwan Champion was a backseat passenger in a rideshare vehicle that police stopped for making a turn without signaling. When officers ordered Mr. Champion out of the car, he took off his jacket and left it on the empty seat before getting out. While one officer patted Mr. Champion down, another reached into the car, grabbed the jacket, and felt what he later confirmed was a handgun.

After the trial court denied Mr. Champion's motion to suppress the gun, a jury convicted him of carrying a pistol without a license and other gun-related offenses.[1] Mr. Champion argues, among other things, that the trial court should have suppressed the gun because the officers violated his Fourth Amendment rights when they frisked the jacket containing the gun without particularized grounds for suspecting Mr. Champion was armed and dangerous. We agree and therefore reverse Mr. Champion's convictions.

---

[1] In addition to CPWL, D.C. Code § 22-4504(a), these charges included possession of an unregistered firearm, D.C. Code § 7-2502.01(a), unlawful possession of ammunition, D.C. Code § 7-2506.01(a)(3), and possession of a large-capacity ammunition feeding device, D.C. Code § 7-2506.01(b).

**I.**

At the suppression hearing, Metropolitan Police Department (MPD) Officer Owais Akhtar testified that he and two other police officers—Officers Brian McCarthy and James Jacobs—were patrolling in an unmarked police vehicle one evening in January 2017. At about 6:10 p.m., they saw a blue Hyundai make a left turn without using a turn signal, and they pulled the car over.[2]

Officers Akhtar and McCarthy approached the driver's side of the Hyundai as Officer Jacobs approached the passenger side. Besides the driver, there were four people in the vehicle—one in the front passenger seat and three in the backseat. When asked, the driver told the police that he worked for an online rideshare service and provided Officer Akhtar with his license and vehicle registration. Officer Akhtar testified that he noticed during this interaction that the passenger seated behind the driver—whom he later learned was Juwan Champion—"appeared nervous," "[h]is eyes were wide open," and "he was just holding his breath." Officer Akhtar knocked on the window and ordered this passenger to exit the vehicle "[b]ecause [he] wanted to talk to him to see why he was so nervous."

---

[2] Officer Akhtar testified that the "area of 900 12th Street, Southeast" was "known for high drugs and guns and violent crimes."

Before getting out of the car, Mr. Champion turned his body to his right—a move the officer called "blading"—propped his knee onto the passenger seat, and removed the jacket he was wearing by pulling each sleeve behind his back as he leaned forward toward the seat. As Mr. Champion was turning, Officer Akhtar opened the rear passenger door and twice asked him what he was doing. Mr. Champion said, "Nothing," and placed the jacket on the empty seat as he got out of the car. The middle rear passenger then placed the jacket next to his thigh.[3]

Officer Akhtar testified at the suppression hearing that he was "afraid that [Mr. Champion] might be discarding evidence or he might be armed" based on his "previous encounters with individuals who are armed." Officer Akhtar asked, "You ain't got no guns on you, right?" and Mr. Champion answered, "Fuck no." Officer Akhtar testified that when he told Mr. Champion that police were going "to pat [him] down real quick okay," he heard Mr. Champion say "okay." When Officer Akhtar asked why he had taken the jacket off, Mr. Champion replied that "he was hot" and that "the jacket smelled like weed."

While Officer McCarthy frisked Mr. Champion outside the vehicle, Officer

---

[3] At trial, Officer Akhtar disagreed with the defense characterization of the jacket as being held in the middle passenger's lap, testifying that "[t]he jacket was next to his thigh and his arm [was] on his thigh."

Akhtar reached into the backseat of the Hyundai and pulled the jacket from the car. He testified that his "attention [was] focused" on the jacket because he "wanted to make sure that if it was any type of evidence in the jacket it wasn't discarded or other people, the rear passengers did not take anything out of the jacket or place it in the jacket." Officer Akhtar felt what he believed was an object "consistent with the shape of a handgun in the jacket" as he removed it from the vehicle. He then said the code word "7/11" to indicate the presence of a firearm and slid the jacket over the Hyundai's roof toward Officer Jacobs. Police found a handgun with an extended magazine within the jacket's left inner pocket.

In ruling on the motion to suppress the handgun, the trial court credited Officer Akhtar's observations about Mr. Champion's nervous demeanor, noting that Mr. Champion was the only passenger the officer ordered out of the car and so "there was something particularized about Mr. Champion's presentation that caused him concern." The court described Mr. Champion's movements as an "awkward" and "very obvious and blatant attempt to shed his jacket" and noted Officer Akhtar's testimony that in his experience, the "turning of one's body or an effort to discard clothing items is often consistent with an individual who is seeking to conceal contrabands including weapons." The trial court ultimately determined that the officers were justified in believing "that there was contraband concealed in the jacket" and that the outer patdown of the jacket did not run afoul of the Fourth

Amendment.[4]  The court did not specifically find that Officer Akhtar had reason to believe that this contraband was a weapon or that Mr. Champion was armed and dangerous.  The trial court permitted the government to introduce the gun at trial, where it became the main evidence supporting the jury's conviction of Mr. Champion on all counts.

## II.

The question before us is whether the trial court erred in concluding that the officers had legal authority under *Terry v. Ohio*, 392 U.S. 1 (1968), to take Mr. Champion's jacket from the backseat and frisk it.[5]  We review that ruling de novo.

---

[4] Although the trial court stated that Mr. Champion's actions gave rise to "probable cause" to believe that Mr. Champion was attempting to hide contraband, we understand the court to have denied suppression based on the line of cases involving reasonable suspicion.  *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1 (1968); *Jackson v. United States*, 56 A.3d 1206, 1209 (D.C. 2012).  The trial court was assessing the legality of Officer Akhtar's initial patdown search of Mr. Champion's jacket—an action subject to the reasonable suspicion standard—and it cited to *Jackson*, which involved a challenge to a determination that police had reasonable suspicion—not probable cause—to search.  At one point the court overruled a defense objection to certain testimony on the ground that the testimony went to whether the officer "believed that there was reasonable, articulable suspicion . . . that the defendant was either armed or in the process of discarding evidence."  On appeal, the government frames the question in terms of reasonable suspicion and does not suggest that the police had, or needed, probable cause to frisk the jacket.

[5] Mr. Champion devotes much of his briefing to a separate contention—that the officer needed, and lacked, reasonable articulable suspicion to order him out of

*Jackson v. United States*, 56 A.3d 1206, 1209 (D.C. 2012).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[6] Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). One such exception allows police officers to conduct a *Terry* patdown search of a person upon reasonable articulable suspicion that the person is armed and dangerous. *Terry*, 392 U.S. at 27. This exception has been extended to the equivalent of a frisk of a vehicle's passenger compartment during a lawful traffic

---

the car. We agree with the government that the Supreme Court has foreclosed this argument. While "[c]ar passengers are 'seized' within the meaning of the Fourth Amendment at the moment the police effectuate a traffic stop," officers "may order the driver and passengers out of the car 'as a precautionary measure, without reasonable suspicion that the [person] poses a safety risk.'" *Zanders v. United States*, 75 A.3d 244, 247-48 (D.C. 2013) (quoting *Brendlin v. California*, 551 U.S. 249, 257-59 (2007)); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending officers' authority to order stopped drivers out of vehicles to passengers).

[6] Passengers "have standing . . . to challenge the validity of a stop," *Zanders*, 75 A.3d at 247 (citing *Brendlin*, 551 U.S. at 257-59), but Mr. Champion does not argue that the stop itself was unreasonable. *See Terry*, 392 U.S. at 9 ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960))). As to Mr. Champion's standing to challenge his individual seizure during the traffic stop, the government conceded in its brief that he had such standing.

stop. *Michigan v. Long*, 463 U.S. 1032, 1050-51 (1983) (upholding a search of the passenger compartment after police saw a weapon in plain view during a lawful traffic stop); *id.* at 1047 ("*Terry* need not be read as restricting the preventative search to the person of the detained suspect."); *Jackson*, 56 A.3d at 1209.

A passenger-compartment search allows officers to "search for weapons on something less than probable cause" where police possess "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Jackson*, 56 A.3d at 1209 (internal quotation marks omitted) (quoting *Long*, 463 U.S. at 1049); *see Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."). A protective search of a passenger compartment is justified only by the "danger [that] may arise from the possible presence of weapons in the area surrounding a suspect" and not an "interest in collecting and preserving evidence," which "is not present in the *Terry* context." *Long*, 463 U.S. at 1049 & n.14. When an officer claims that he "reacted out of a need to take protective action," we must "ensure that the claim is objectively credible and reasonable when viewed through the officer's eyes." *(Wilbur) Johnson v. United States*, 350 A.2d 738, 741 (D.C. 1976); *see also United States v. Hussain*, 835 F.3d 307, 313 (2d Cir. 2016) (stating

that a *Terry* search must be "genuinely protective"). In deciding whether an officer had "a 'particularized and objective basis' for his suspicion" that the suspect was armed and dangerous, we examine the "totality of the circumstances." *Jackson*, 56 A.3d at 1209 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[S]pecificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18.

In the view of the trial court here, Mr. Champion's awkward removal of his jacket justified Officer Akhtar's frisk of the jacket. The court singled out no other factors that supported reasonable suspicion to conduct a frisk except for noting that Mr. Champion's perceptible nervousness led police to get him out of the car. Accordingly, although "we examine all . . . factors individually and collectively," *Green v. United States*, 662 A.2d 1388, 1390 (D.C. 1995), "because the circumstances would likely fall short of constituting reasonable suspicion in the absence of" some sort of suspicious movement, we turn to Mr. Champion's act of turning while taking off his jacket "first in the totality-of-the-circumstances analysis." *Jackson*, 56 A.3d at 1210.

As the court described it, Mr. Champion, while "in a cramped spot," was "able to struggle or wiggle out of his jacket in a very obvious and blatant attempt to

shed his jacket." The only thing "very obvious" to the trial court was that Mr. Champion went "to great lengths" to take off his jacket. It was less obvious, but still inferable, that Mr. Champion was removing his jacket because he wanted to keep something from the police. But as to the nature of what Mr. Champion may have been trying to conceal, his movements remained unenlightening. Nothing indicated, for example, that he was trying to conceal a weapon as opposed to some other type of contraband like a controlled substance—or even the smell of that substance on his jacket.

Both the trial court and Officer Akhtar recognized that ambiguity. The trial court did not find that Mr. Champion's removal of his jacket had the hallmarks of a preparation to wield or use a weapon, but rather that his movements indicated he was "attempting to hide contraband" more generally. Indeed, "there was nothing particularized about the gesture indicating [Mr. Champion] was hiding or retrieving a weapon," *Jackson*, 56 A.3d at 1210, and Officer Akhtar did not describe it that way. He stated instead that he wanted to ensure that "any type of evidence in the jacket . . . wasn't discarded"—a concern he mentioned more than once. To the extent Officer Akhtar believed that a weapon was one possible form of contraband that could be in the jacket, he remained focused on the possibility of evidence destruction rather than danger—as he noted, "people toss firearms." The officer's focus upon the risk that "evidence" might be lost rather than the risk that Mr.

Champion might use a weapon to hurt someone cuts against any sense that Mr. Champion's removal of his jacket would have "induce[d] an officer's reasonable fear for his safety." *Powell v. United States*, 649 A.2d 1082, 1090 (D.C. 1994) (Farrell, J., concurring).

In cases like this in which the defendant's behavior suggests an attempt to conceal something from police, reasonable suspicion does not require unmistakable evidence that what the defendant was trying to hide was a weapon. Assessing particularized suspicion "does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418 (1981). As Judge Farrell stated in *Powell,* the "unambiguous effort to conceal a weapon" that was at issue in *In re D.E.W.*, 612 A.2d 194, 198 (D.C. 1992), "does not set a minimal standard for judging whether a particular bodily gesture could induce an officer's reasonable fear for his safety." 649 A.2d at 1090 (Farrell, J., concurring). On the other hand, the totality of the circumstances must contain at least some indication that the concealed item is a weapon, and reasonable suspicion will rarely if ever be established solely by evidence that the defendant appeared to be concealing *something.* Three cases in particular inform our view that in this case Mr. Champion's removal of his jacket did not, without more, provide reasonable articulable suspicion to frisk the jacket.

Perhaps the most similar case factually is *United States v. Page*, 298 A.2d 233

(D.C. 1972), where Mr. Page was the back seat passenger of a car whose driver was pulled over for speeding. When police stopped the car, Mr. Page "looked around at the officers and then moved his right arm and shoulder 'as if to hide something' or 'put something away, get something.'" *Id.* at 234. As one officer testified, "it was obvious that [Mr. Page] was trying to hide something," and indeed, when asked, Mr. Page said he was hiding a beer can. *Id.* An officer who said he feared for his and another officer's safety stepped Mr. Page out of the car and frisked him, finding in his pocket the pistol that was the subject of the suppression motion. *Id.* In evaluating the reasonableness of the frisk, we stated that "furtive movements standing alone would hardly warrant a search of the individual concerned" and deemed it "of considerable significance" that Mr. Page's movements "were not made by a suspect but by a passenger in the rear seat of a car stopped for speeding." *Id.* at 237. Given that "the only reason for the stop and investigation [was] a simple traffic offense without any indication of criminal activity either on the part of the driver or passengers," the "vague suspicion" based on "ambiguous" movement that the officer construed as an "obvious" attempt to hide something did not establish reasonable suspicion to frisk Mr. Page. *Id.* at 237.

*Jackson v. United States*, 56 A.3d 1206 (D.C. 2012), likewise indicates that evidence creating a reasonable suspicion that a defendant was trying to conceal something during a traffic stop may not in itself justify a frisk in the absence of a

more particularized basis for suspecting that a defendant was armed and dangerous. There, during a traffic stop for a suspected window-tinting violation, Mr. Jackson made some ambiguous movements of his hands around the dash area that made police think he "might be hiding or trying to retrieve contraband." *Id.* at 1210. An officer testified at the suppression hearing that "a lot of people when they do a lot of movement around usually they start to place weapons or try to retrieve weapons or what have you." *Id.* at 1208. Notwithstanding this testimony and the officers' description of Mr. Jackson's hand movements, the court concluded that Mr. Jackson's actions did not provide reasonable suspicion to allow a warrantless *Michigan v. Long*-type search of Mr. Jackson's van. In reaching that conclusion, the court summarized a line of prior decisions in which this court determined the extent to which certain movements of people in vehicles during traffic stops justified a reasonable belief that the defendant was armed and dangerous. The court identified distinctions between movements like Mr. Jackson's and movements that this court has previously associated with reaching for a gun—such as reaching under the driver's seat of a car or pushing an object into his pants in a maneuver uniquely suggestive of concealing a gun.[7] *Id.* at 1210. As in *Page*, the suspicion that Mr.

---

[7] The dissent quotes this discussion in *Jackson* to suggest that this court has routinely found an attempt to conceal "something that could have been a weapon" sufficient to give rise to reasonable articulable suspicion. *Post* at 31 n.18. But we clarified in *Jackson* that the particular gesture discussed in the cases the dissent

Jackson was hiding contraband was insufficient to justify the search in the absence of some other particularized indication that he might be concealing a gun or otherwise dangerous—even though the traffic stop occurred shortly before 11 p.m. in a "high drug area of the city." *Id.* at 1214.

We also rely on *Hawkins v. United States*, 248 A.3d 125 (D.C. 2021), where the reasonable suspicion inquiry centered around Mr. Hawkins's behavior upon seeing the police drive up to the driveway where he was sitting with another man. *Id.* at 127. An officer testified that police were patrolling in that area because of "an increase in violent crime." *Id.* Similar to the present case, Mr. Hawkins's movement of his hands around his satchel caused police to suspect he was concealing contraband—though in a satchel, not a jacket—and the officer was particularly concerned that Mr. Hawkins was concealing a gun because the officer's unit had recently "recovered many firearms" from satchels. *Id.* The court held that the requisite suspicion was not established by the defendant's "nervousness upon seeing the police officers . . . the repeated movements of his hands toward his satchel," and

---

cites—reaching down under a car seat—created reasonable articulable suspicion because our cases have "identifi[ed] a link between the nature of [that] particular gesture and a likelihood that the person making [that] gesture is armed." *Jackson*, 56 A.3d at 1211. In other words, we determined in those cases that the defendant was not merely concealing "something," but concealing something reasonably likely to be a firearm.

the officer's testimony about violent crime in the neighborhood and the common practice of hiding guns in satchels. *Id.* at 131. Mr. Hawkins's demeanor led police "to suspect [the satchel] contained contraband," but because the officer "did not claim to have seen a telltale bulge or any part of a weapon" and because the officer's reference to a trend of finding guns in satchels "was not supported by details which would allow the court to 'evaluate the reasonableness of [this] particular search,'" reasonable suspicion did not justify the warrantless search of the satchel. *Id.* (alteration in original) (quoting *Terry*, 392 U.S. at 21).

Under *Page*, *Jackson*, and *Hawkins*, Mr. Jackson's attempt to shed his jacket—no matter how "obvious and blatant"—"cannot be the decisive fact justifying a frisk that was otherwise unwarranted." *Powell*, 649 A.2d at 1091 (Farrell, J., concurring). We reach this conclusion assuming that one could reasonably interpret Mr. Champion's removal of his jacket as an attempt to hide something.[8] As these cases demonstrate, evidence supporting a suspicion that a

---

[8] Though we view *Page, Jackson,* and *Hawkins* as most analogous to the circumstances of this case, our conclusion that Mr. Champion's movements did not, without more, provide reasonable particularized suspicion to conduct a frisk finds support in other decisions as well. *See, e.g.*, *Hussain*, 835 F.3d at 314-15 (holding that, although the passengers' movements indicated they might be hiding "something," the movements did not support an objectively reasonable suspicion that they were dangerous in order to justify a protective search of automobile); *United States v. Jones*, 606 F.3d 964, 967 (8th Cir. 2010) (concluding that where an officer observed Mr. Jones walking with his hand held against his midriff, the officer

defendant was trying to hide something typically will not give rise to reasonable suspicion justifying a frisk where police are unable "to recount specific facts"—in addition to the ambiguous gesture of concealment—"that suggest the suspect is concealing a weapon in that location."[9] *Maye v. United States*, 260 A.3d 638, n.6 (D.C. 2021) (quoting *In re Jeremy P.*, 11 A.3d 830, 838 (Md. 2011)).

The remaining circumstances—examined along with Mr. Champion's awkward turning movement—do not provide an objective basis for police to suspect Mr. Champion was armed and dangerous and thus to frisk his jacket. Police here

---

"lacked the requisite reasonable suspicion that Jones was carrying a concealed firearm in his hoodie pocket, as opposed to some other object, or no object at all"); *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (stating that a *Terry* frisk involves a "more specific analysis, requiring the officer to hold a reasonable suspicion that the suspect is 'armed and dangerous' as opposed to being generally suspicious"); *cf. Duhart v. United States*, 589 A.2d 895, 898-99 (D.C. 1991) (holding that Mr. Duhart's actions, which included "shov[ing] an item into his pocket" and removing his hands from his pocket "reluctantly" after the officer asked him to do so twice, did not generate reasonable suspicion of a crime).

[9] The dissent contends that we are imposing a more stringent test than the Fourth Amendment requires—one that permits a protective search under *Terry* only if the suspect makes a movement that "unambiguously" indicates that he is armed. *Post* at 34. In fact, our holding acknowledges that an ambiguous gesture of concealment may give rise to reasonable suspicion justifying a *Terry* search as long as the totality of the circumstances otherwise provides some indication that the concealed item is a weapon. This aligns with this court's precedent, while the dissent's view—that officers are entitled to conduct a protective search of anyone who appears to hide anything that could reasonably be a weapon—contravenes those decisions and erodes the protections of the Fourth Amendment. *See post* at 36.

did not receive a specific report of criminal activity in the area, *see, e.g.*, *Joseph v. United States*, 926 A.2d 1156, 1163 (D.C. 2007), and they stopped the vehicle because of a minor traffic violation and not "some graver offense." *Jackson*, 56 A.3d at 1214 (quoting *Powell*, 649 A.2d at 1091, n.5 (Farrell, J., concurring)). Officer Akhtar did not otherwise know or suspect Mr. Champion to be dangerous because of any criminal history or prior encounters with him, and when asked, Mr. Champion said that he did not have a gun on him. *See, e.g.*, *United States v. Palmer*, 360 F.3d 1243, 1248 (10th Cir. 2004); *State v. Buchanan*, 799 N.W.2d 775, 782-83 (Wis. 2011). Officer Akhtar did not testify about any "telltale bulge" in the jacket that might have warranted a reasonable suspicion that he was armed. *Hawkins*, 248 A.3d at 131; *see also United States v. Bellamy*, 619 A.2d 515, 524 (D.C. 1993) ("Nor did the officers see any physical sign of a concealed weapon, such a bulge in one of the appellees' clothing.").

And while Mr. Champion's nervousness is a valid consideration, it did little here to signal specifically that there was a gun in his jacket. *See, e.g.*, *In re D.T.B.*, 726 A.2d 1233, 1236 (D.C. 1999) (finding fidgeting and nervousness insufficient to support reasonable suspicion of criminal activity); *Powell*, 649 A.2d at 1090 (Farrell, J., concurring) (concluding that neither the suspect's gesture of reaching toward the passenger side of the vehicle, nor the suspect's observed demeanor of being "nervous and initially unresponsive" in giving the officer his driver's license and

registration, could justify a patdown); *see also Dozier v. United States*, 220 A.3d 933, 944 (D.C. 2019) ("As is known from well-publicized and documented examples, an African-American man facing armed policemen would reasonably be especially apprehensive."). Further, "although it was dark"—a consideration that often supports reasonable suspicion in a totality-of-the-circumstances analysis— 6:10 p.m. was "not an unusual hour for citizens of this city to be walking the streets." *Compare Curtis v. United States*, 349 A.2d 469, 471-72 (D.C. 1975) (making this observation about 7:20 p.m.), *with Umanzor v. United States*, 803 A.2d 983, 994 (D.C. 2002) (observing that a stop made at 2:45 a.m. was a factor in support of reasonable suspicion).

While Officer Akhtar's past experience is relevant, *James v. United States*, 829 A.2d 963, 968 (D.C. 2003), his suspicions regarding Mr. Champion were "too generalized" to provide reasonable, articulable, particularized suspicion that Mr. Champion was armed and dangerous. *See Maye*, 260 A.3d at 649; *see also Hawkins*, 248 A.3d at 131.[10] Similar to the trial court, which concluded that Mr. Champion's movement was "consistent" with someone trying to "conceal contraband[]"—which

---

[10] *Terry* itself instructs that we give "due weight" to an officer's "specific reasonable inferences which he is entitled to draw from the facts in light of his experience" rather than his "inchoate and unparticularized suspicion or 'hunch.'" 392 U.S. at 27.

of course can be nonhazardous—Officer Akhtar testified in terms that likewise did not convey a pointed suspicion of dangerousness stemming from something other than the act of hiding something. When asked why he thought Mr. Champion "might be discarding evidence or . . . armed," he described his prior traffic stops in which people took actions—reaching under seats, into the center console, and into the glove compartment—that Mr. Champion did not take. And while Officer Akhtar also noted that "people turn their body away"—as Mr. Champion did—when "they're concealing firearms," this observation appears to encompass the concealment of contraband generally in addition to the concealment of firearms. *See Golden v. United States*, 248 A.3d 925, 940, 942-44 (D.C. 2021) (determining that where a bulge on the defendant's hip "could have been 'anything,'" that officer's observations of the bulge and a sweatshirt tied around his waist on a warm night were too generalized to support reasonable articulable suspicion that Mr. Golden was carrying a firearm and dangerous); *cf. United States v. Taylor*, 49 A.3d 818, 827 (D.C. 2012) ("Without a great deal more detail, we have no basis for determining whether such behavior is indeed 'typical' of someone driving under the influence."). "[T]here are limits to the inference that an experienced reasonable police officer can rationally draw," *Duhart*, 589 A.2d at 899, and Officer Akhtar's statement about his past experiences lacked "particularized fact[s]" to conclude that the jacket contained a weapon. *See id.*

Our dissenting colleague considers another factor in support of reasonable suspicion—namely, the "ubiquity of firearms in the District of Columbia." *Post* at 1; *see also post* at 4 ("This is a city in which firearm possession is rampant."). This court has rejected the notion that "the Fourth Amendment's protections should ebb when crime rates rise." *T.W.*, 292 A.3d 790, 804 (D.C. 2023). "If high crime rates were grounds enough for disposing of Fourth Amendment protections, the Amendment long ago would have become a dead letter." *Samson v. California*, 547 U.S. 843, 865 n.6 (2006) (Stevens, J., dissenting) (quoted in *T.W.*, 292 A.3d at 805). Further, the dissent refers to the ubiquity of guns in the present day as opposed to 2017, when police conducted the frisk of Mr. Champion's jacket. In any case, the record substantiates neither scenario.[11] *Cf. T.W.*, 292 A.3d at 805 (stating that in 2018, "violent crime in the District of Columbia was the lowest it had been in decades").

---

[11] What *is* relevant is specific information in the record regarding the area where the stop occurred, such as Officer Akhtar's testimony that the area was "known for high drugs and guns and violent crimes." *Jackson*, 56 A.3d at 1214. Notwithstanding its relevance, we accord this consideration little weight in light of the vagueness of Officer Akhtar's description and the absence of evidence meaningfully linking Mr. Champion to the neighborhood. *See Bellamy*, 619 A.2d at 522 (stating that "reliance on the character of the streets and what has been happening recently is not the same as the particularized, individualized suspicion that is required under *Terry*").

"It falls to courts to ensure that even these brief stops and limited protective searches are not executed with inadequate justification." *Robinson v. United States*, 76 A.3d 329, 340 (D.C. 2013). Taken together, the additional observation of Mr. Champion's nervousness and the surrounding circumstances—the time and location of the stop—do not "tip the balance" toward dangerousness.[12] *Jackson*, 56 A.3d at 1210. Accordingly, the trial court should have suppressed the firearm as the fruit of an unlawful search.

**III.**

For the foregoing reasons, we reverse the judgment of the Superior Court and remand for further proceedings consistent with this opinion.[13]

---

[12] The dissent says it is unaware of any other case in which "such a combination of specific and articulable factors" was deemed insufficient for reasonable suspicion. *Post* at 34. While no one case is likely to match the exact factors present in any other, the factors in *Jackson* are closely analogous. Not only did Mr. Jackson make an ambiguous hand movement that the officer interpreted as an act of concealment, but this movement occurred (1) during a traffic stop, (2) shortly before 11:00 p.m., (3) in a high crime neighborhood, and (4) with another vehicle occupant in the passenger seat. *Jackson*, 56 A.3d at 1214. And Mr. Jackson's responses were arguably "implausible": he twice replied "nothing" when asked what he was doing. *Post* at 33; *Jackson*, 56 A.3d at 1208. The totality of the circumstances analysis here does not strike us as dramatically distinct from that in *Jackson*.

[13] Mr. Champion also argues that the trial court erred in excluding a

*So ordered*

GLICKMAN, *Senior Judge*, dissenting: The majority opinion holds that appellant's apparent attempt to hide something in his jacket from the police did not justify even Officer Akhtar's minimally invasive protective patdown of the jacket because appellant's behavior was ambiguous—it did not indicate with precision that what appellant was hiding was a dangerous weapon rather than some other, nonhazardous contraband. In so holding, I believe the majority opinion misapplies the applicable standard of objectively reasonable *suspicion* that an individual whom the police are confronting *might be* armed and dangerous. The majority opinion imposes a substantially more stringent test than the Fourth Amendment requires—a test that unreasonably heightens the life-threatening dangers to which both the police and the public are exposed in day-to-day law enforcement and in traffic stops

---

photograph found on a cell phone Mr. Champion had in his hand at the time of the search. Defense counsel sought to admit the photograph, which depicted the middle passenger holding a gun, to support the theory that the middle passenger planted the gun in the jacket. Because we have reversed Mr. Champion's convictions, "[w]e see no reason to expect that this issue would recur in any retrial, and we therefore do not address it." *Broom v. United States*, 118 A.3d 207, 217 n.3 (D.C. 2015); *see also Golden*, 248 A.3d at 948 ("[O]ur Fourth Amendment holding precludes the government from introducing, at any retrial, its evidence concerning Mr. Golden's possession of a gun.").

especially.

Reasonable articulable suspicion necessary to justify a protective frisk for dangerous weapons means "more than a mere hunch or gut feeling," but it is not a high bar; it is "*substantially* less than probable cause."[1]  "[O]nly reason to suspect that the person *may* be armed—not reason to believe he *is* armed—is necessary to justify the frisk."[2]  Accordingly, "[e]ven if each specific act by a suspect could be perceived in isolation as an innocent act," we must consider the totality of the circumstances, which "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."[3]  And

---

[1] *James v. United States*, 829 A.2d 963, 966 (D.C. 2003) (emphasis added, internal quotation marks omitted).  Similarly, we have cautioned that "[t]he requirement of 'articulable suspicion' is not an onerous one" and have reiterated that the "level of justification" for a protective frisk "is 'less demanding' than probable cause and 'considerably less' than preponderance." *Singleton v. United States*, 998 A.2d 295, 299, 300 (D.C. 2010) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

[2] *(Walter) Johnson v. United States*, 33 A.3d 361, 368 (D.C. 2011) (emphasis in the opinion); *see generally Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding that a protective frisk is permitted "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity *may* be afoot and that the persons with whom he is dealing *may* be armed and presently dangerous" (emphasis added)).

[3] *Peay v. United States*, 597 A.2d 1318, 1320, 1322 (D.C. 1991) (en banc) (citation omitted); *see also, e.g., Golden v. United States*, 248 A.3d 925, 934 n.13 (D.C. 2021) ("[I]n determining whether the officer acted reasonably, . . . due weight must be given . . . to the specific reasonable inferences which he is entitled to draw

where, as here, we are reviewing the trial court's denial of a motion to suppress, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling."[4]

As I discuss below, appellant's furtive behavior with his jacket by itself provided reason to suspect he was hiding what could have been (and in fact was) a gun in the jacket, and the confluence of surrounding circumstances magnified that evident risk. The palpable possibility was enough under those circumstances to support a reasonably cautious police officer's "articulable and objectively reasonable belief that [appellant was] *potentially* dangerous."[5] It therefore justified Officer Akhtar's prudent and minimally invasive patdown of the jacket, which revealed the presence of a gun. Given the ubiquity of firearms in the District of Columbia, and the fact that "investigative detentions involving suspects in vehicles

---

from the facts in light of his experience." (quoting *Terry*, 392 U.S. at 27)).

[4] *Peay*, 597 A.2d at 1320. The majority opinion notes that the motions judge "did not specifically find that Officer Akhtar had reason to believe that this contraband [apparently hidden in appellant's jacket] was a weapon or that Mr. Champion was armed and dangerous." *Ante* at 6. Where the trial court has not made express findings, "the appellate court is to 'determine if the denial of the motion to suppress is supportable under any reasonable view of the evidence.'" *Id.* at 1320 (quoting *Brooks v. United States*, 367 A.2d 1297, 1304 (D.C. 1976)).

[5] *Michigan v. Long*, 463 U.S. 1032, 1051 (1983) (emphasis added).

are especially fraught with danger to police officers,"[6] I view the majority opinion as very unfortunate.

The confrontation in this case occurred in the course of a concededly lawful traffic stop. It took place at night in a location "known for high drugs and guns and violent crimes," as Officer Akhtar testified without contradiction.[7] It was dark out at the time.[8] As this court has recognized in the past, these two circumstances

_____

[6] *Id.* at 1047.

[7] My colleagues in the majority state that "[n]otwithstanding its relevance," they accord "little weight" to Officer Akhtar's description of the area on account of its "vagueness" and the "absence of evidence meaningfully linking Mr. Champion to the neighborhood" in which the police found him to be present. *Ante* at 20 n.11. I submit this is an example of the majority's failure to view the evidence as we are obliged to view it—from the perspective of a reasonable and cautious police officer on the scene and guided by his experience and training, and drawing all reasonable inferences in favor of sustaining the trial court's ruling.

[8] My colleagues concede that the fact it was dark was another "consideration that often supports reasonable suspicion in a totality-of-the-circumstances analysis," but they go on to minimize its significance in this case by observing that the time of the stop, "6:10 p.m.[,] was not an unusual hour for citizens in this city to be walking the streets." *Ante* at 18 (quotation marks omitted). This observation is of scant relevance; there is no evidence that any persons were "walking the streets" at the time and place of the traffic stop in this case, and regardless of the actual time of day and the proximity of any pedestrians, the darkness was a significant factor in the calculus of danger in the stop for the obvious reason that it increased the danger of a surreptitious attack on the police by anyone in the stopped vehicle with access to a weapon. I submit this is another example of the majority's failure to view the evidence from the proper perspective of the police conducting the stop.

heightened the need for caution and alertness to danger on the part of the police.[9]

There were five people in the car, the driver and four passengers. Appellant was sitting in the backseat behind the driver, next to two other passengers. When the police got out of their vehicle and approached the car, Officer Akhtar noticed that appellant "appeared nervous," "[h]is eyes were wide open," and "he was just holding his breath" (as the officer testified). That the arrival of the police made appellant visibly anxious was an additional circumstance indicating that appellant might pose a threat and that the police needed to be on their guard, as this court previously has recognized.[10]

Officer Akhtar lawfully ordered appellant to get out of the car, but appellant did not promptly comply. Instead, though it was a cold night in January, appellant first undertook to carefully remove his jacket and leave it on the seat next to his

---

[9] *See, e.g.*, *Jackson v. United States*, 56 A.3d 1206, 1214 (D.C. 2012).

[10] *See id.* The majority opinion acknowledges that appellant's nervousness was a "valid consideration" in determining whether appellant might have been armed, but dismisses its significance because "it did little here to signal specifically that there was a gun in his jacket." *Ante* at 17. Here again, I submit the majority is failing to apply the proper standard of appellate review, for as previously noted, it is a mistake to assess the evidence piecemeal and dismiss each piece because it is consistent with innocence or not sufficiently probative on its own; the entire mosaic of the evidence may, and in this case does for reasons I discuss, support a reasonable concern that appellant might have had a dangerous weapon.

companion.  Appellant did not simply take his jacket off in the ordinary manner.  As shown in the recording made by Officer Akhtar's bodyworn camera, appellant turned so that his back was to the open car door and the officer could not see the front of his jacket.  In an odd series of movements, appellant put his knee on the passenger seat, leaned forward towards the back of the seat, and proceeded to remove his jacket by pulling each sleeve behind his back.  Appellant then placed the jacket on the seat next to the thigh of the middle rear passenger.  Only then did appellant get out of the car.  The motions judge was struck by the awkwardness of appellant's movements as he went to "great lengths" in "a cramped spot" in order to "shed his jacket" before he emerged from the car; the judge commented that this activity went *beyond* a mere "furtive sort of reaching under the seat or wiggling one's body."  When Officer Akhtar asked appellant what he was doing and why he took his jacket off, appellant responded evasively and said he was "hot" (on a night in January) and that his jacket "smelled like weed."

The motions judge credited Officer Akhtar's testimony during the suppression hearing that appellant's movements in "blading" his body and removing his jacket caused him to be "*afraid* that [appellant] might be discarding evidence *or he might be armed.*"[11]  (Emphasis added.)  The officer explained that "when they have

---

[11] My colleagues suggest in passing that Officer Akhtar's testimony at the

firearms also on the street too, people will turn their body away where they're concealing the firearm." Officer Akhtar voiced this suspicion on the scene, asking appellant directly if he was carrying a gun; appellant denied it.

Appellant's apparent effort to withhold his jacket from police scrutiny amply justified an objectively reasonable suspicion that he was hiding *something* in his jacket that was illegal for him to possess. "In fact, 'deliberatively furtive actions . . . at the approach of . . . law officers are *strong* indicia of *mens rea*.'"[12] And appellant's answers when asked what he was doing hardly dispelled the officer's reasonable suspicion; if anything, they increased it.[13] My colleagues dispute this; they assert that "nothing indicated" that appellant "was trying to conceal a weapon

---

hearing on appellant's motion indicated that he did not really fear for his safety and was more focused on preserving evidence. *Ante* at 10. Since Officer Akhtar actually pressed appellant at the scene on whether he had a gun, and testified that he was "afraid" appellant might be armed, I think my colleagues' surmise is unwarranted. However, it does not matter, for "[t]he test [for reasonable articulable suspicion] is an objective rather than a subjective one, . . . and thus it is not essential that the officer actually have been in fear." Wayne R. LaFave, 4 *Search & Seizure: A Treatise on the Fourth Amendment* § 9.6(a), pp. 869 (6th ed., Oct. 2022 update) (hereinafter, "LaFave") (footnote omitted).

[12] *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (quoting *Sibron v. New York*, 392 U.S. 40, 66 (1968)).

[13] *See, e.g.*, *Jackson*, 56 A.3d at 1214; LaFave, § 9.6(a) ("[I]f in response to inquiries the suspect gives an implausible account of his actions, this can help establish grounds to frisk.").

as opposed to some other type of contraband like a controlled substance—or even the smell of that substance on his jacket." *Ante* at 10. That is a bit of an overstatement, for appellant's awkward removal of the garment in a peculiar manner that blocked Officer Akhtar's view strongly implied an effort to hide more than just its odor from the police. But even if appellant's explanation was more plausible than I believe it was, it did not serve to remove the entirely reasonable and common sense suspicion that he was hiding an illicit object of some kind in his jacket.

So what contraband would a cautious police officer reasonably have thought appellant might have been taking such trouble to hide from the police? Traffic stops are known to be dangerous because people carry guns. This is a city in which firearm possession has been rampant. Realistically speaking, I think it cannot be denied that for a police officer at the scene, there was a reasonable likelihood—not a certainty, to be sure, but a reasonable likelihood—that it was a gun or other dangerous weapon that was concealed in appellant's jacket. That was no mere "inchoate and unparticularized suspicion or 'hunch.'"[14] It was an objectively reasonable inference from appellant's unusual behavior in the surrounding circumstances, and it was, indeed, the inference that Officer Akhtar voiced at the time, based on his observations and on his experience as he explained in his testimony. In cases

---

[14] *Terry*, 392 U.S. at 27.

involving comparable traffic stops, this and other courts have found that a minimally invasive, protective frisk for weapons was justified by an individual's similarly "awkward movements manifesting an apparent effort to conceal something under his jacket" or other apparel.[15] In *In re D.E.W.*, for example, this court held that where an officer conducting a traffic stop saw a passenger "shove something down the front part of his pants'" and hold "his hands over the area where he was pushing,"[16] the officer had reasonable articulable suspicion that the passenger was concealing a weapon, and "acted reasonably by ordering [the passenger] out of the car and frisking him."[17] In *Jackson*, we cited a number of other cases in this

---

[15] LaFave, § 9.6(a), pp. 878-79 (citing, *inter alia*, *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998) ("Because Raymond awkwardly exited the car and unnaturally leaned against it in an attempt to conceal an object under his jacket and pants, the state troopers were justified in performing a *Terry* patdown for weapons.") and *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) ("Dortch responded to the sight of an approaching police officer by actively moving in such a way — pressing the front of his body against the minivan — as to further conceal what, if anything, he had in his coat.")); *see also United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (holding that "furtive movements" of passenger in car stopped for traffic violation and "his evasive and deceptive responses when asked what he was doing at that time" supported officer's objectively reasonable suspicion that passenger had a weapon).

[16] 612 A.2d 194, 195 (D.C. 1992).

[17] *Id.* at 198. We commented that the officer "observed movement that was more than a furtive gesture; he observed what appeared to him to be an unambiguous effort to conceal a weapon." *Id.* Of course, the officer might have been mistaken; the passenger might instead have been trying to conceal drugs or other nondangerous contraband. That alternative possibility did not render the officer's suspicion or his

jurisdiction in which we appreciated that the defendant's attempted concealment of something that could have been a weapon "[gave] rise to reasonable suspicion" supporting a protective search.[18]

There is one more factor present here that heightened the danger to the police in this traffic stop and strongly supported the reasonableness of Officer Akhtar's patdown of appellant's jacket to see if it contained a firearm. When appellant finally exited the car, he left his jacket in the control of the other passengers remaining in the backseat. Not only might appellant himself return to the jacket at the conclusion of the stop, but his fellow passengers had unfettered access to it and any dangerous weapon it held while the police were still at the scene, "at close range," and "particularly vulnerable" to gunfire from within the vehicle.[19] In that situation,

protective frisk unreasonable.

[18] 56 A.3d at 1210 (citing the following cases in addition to *In re D.E.W.*, *supra*: *McGee v. United States*, 270 A.2d 348, 349 (D.C. 1970) ("reaching down and appearing to place something under the seat"); *Green v. United States*, 465 F.2d 620, 623 (D.C. Cir. 1972) ("pulling something out of his belt and placing it under his seat"); *James v. United States*, 829 A.2d 963, 964, 966-67 (D.C. 2003) ("lifting his body up, then bending way down as if putting something underneath the driver's seat"); and *United States v. Glover*, 851 A.2d 473, 477 (D.C. 2004) ("noting that a search of Glover's car would likely have been justified if the trial court credited testimony that Glover made 'a suspicious reaching movement toward the area below his seat'")). (I quote *Jackson*'s description of the suspicious conduct in each case.)

[19] *Long*, 463 U.S. at 1052 (quoting *Terry*, 392 U.S. at 24).

Officer Akhtar had to "make a 'quick decision as to how to protect himself and others from possible danger.'"[20]  After appellant had exerted himself so conspicuously in an apparent effort to conceal what the jacket held, Officer Akhtar would have been grossly negligent had he allowed the car's remaining occupants to handle the jacket while the police investigation was in progress without first confirming that no weapon was hidden in the jacket.  "In such circumstances," the Supreme Court has stated, "we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter."[21]

So in my view, the following circumstances in their totality manifestly furnished reasonable articulable suspicion that appellant was armed and dangerous sufficient to justify Officer Akhtar's patdown of appellant's jacket for a firearm:  the encounter occurred during a traffic stop on a dark night in what Officer Akhtar knew to be a high crime area; appellant, though only a passenger in a car stopped for a minor traffic infraction, was visibly quite nervous in the presence of the police; when he was ordered out of the car, appellant did not comply promptly; instead, he first took the trouble to remove his jacket (though it was a cold January night) in an awkward manner that obscured it from Officer Akhtar's sight; appellant then left the

---

[20] *Id.* (quoting *Terry*, 392 U.S. at 28).

[21] *Id.*

jacket behind when he finally exited the car; Officer Akhtar reasonably inferred that appellant had attempted to conceal something in the jacket; the hidden item very well could have been a gun or other dangerous weapon, and that is what Officer Akhtar suspected; he based that suspicion not only on his observations of appellant, but also, in part, on his professional experience seeing how people act when they are trying to hide guns; when asked why he had taken his jacket off, appellant's answers were implausible; the jacket along with its hidden contents remained in the control of appellant's companions in the car; and if the jacket did contain a weapon, one of those companions could have grabbed it and used it against the police, as could appellant himself upon his return to the car. It is difficult for me to see that any reasonably cautious police officer would have failed to check out appellant's jacket under these circumstances.

My colleagues argue that appellant's "removal of his jacket did not, *without more*, provide reasonable articulable suspicion to frisk the jacket." *Ante* at 11 (emphasis added).[22] But here, appellant did not simply remove a jacket; he removed

---

[22] The majority opinion supports this statement with the assertion that "reasonable suspicion will rarely if ever be established solely by evidence that the defendant appeared to be concealing *something*." *Ante* at 11. I think that to be an overstatement; in the cases I have cited in note 18, *supra*, it generally was enough to justify a protective search if the suspects' movements raised suspicions that they were actively trying to hide "something" from the police that reasonably could have been a weapon. In any event, though, the frisk of the jacket in the present case was

it in a highly suspicious manner seemingly designed to shield what it harbored from the view of the police. And as I have just shown, there was considerably "more" in the totality of the circumstances confronting Officer Akhtar. The majority opinion cites no case, and I am not aware of one, in which such a combination of specific and articulable factors was deemed insufficiently particularized to support a reasonably limited protective frisk to ensure the safety of the police and others on the scene.

Furthermore, my colleagues' apparent insistence that a suspect's furtive movements must "specifically" or "unambiguously" indicate that the suspect is armed in order to justify a protective search under *Terry* and *Michigan v. Long* is quite problematic on its own terms. It is inconsistent with the constitutional standard that, as previously pointed out, demands only a reasonable articulable suspicion that the suspect *may* be armed. And it is difficult to understand what kinds of movements the opinion envisions as being specific or unambiguous enough. The majority opinion is quite vague on this. It refers to "movements that this court has previously associated with reaching for a gun—such as reaching under the driver's seat of a car or pushing an object into his pants in a maneuver uniquely suggestive of concealing

---

not justified "solely" by the evidence that appellant appeared to be concealing something, but rather by that evidence in combination with the significant attendant circumstances indicative of heightened danger that I have listed.

a gun," *ante* at 13, but that is unhelpful as a workable standard. There is nothing about those particular movements that "specifically," "uniquely," or "unambiguously" indicates the unseen object is a weapon as opposed to illicit drugs or other contraband; nor are those movements the only furtive gestures or actions by a suspect that might suggest the presence of a concealed weapon. The reality is that persons attempting to hide weapons or other contraband when police appear on the scene try, as appellant did, to avoid revealing what it is they are concealing (or even that they are doing so). They don't wave the item around for the police to see whether it is a weapon or not. Rarely, if ever, will the suspect's gestures or movements be such as to unambiguously reveal the nature of the item being hidden; the same gestures and movements may be used to conceal a gun as to conceal a package of cocaine. Occasionally the nature of the hiding place itself may be informative; if the unknown item is hidden in a cigarette package, for example, it probably is not a gun. But usually, the most that can be said is that the suspect hid something in apparent response to the police presence that reasonably could have been a weapon under the circumstances. As a practical matter, if we care about the safety of police officers and bystanders, that observation is and will have to be enough to justify a protective search.

And the Fourth Amendment is meant to be practical. Once it is apparent to police that a suspect is hiding what *might* be a weapon, the Fourth Amendment does

not require anything like the greater level of certainty to support a *Terry* frisk that the majority opinion demands. In the roadside encounter we are dealing with here, a reasonable suspicion that appellant posed a danger that "*may* arise from the *possible* presence of weapons" in his jacket was all the police needed to justify a protective patdown of that jacket.[23] A defendant's effort to conceal a weapon need not be unambiguous to satisfy this standard. By definition, a reasonable suspicion is based on inconclusive evidence. In requiring an absence of ambiguity, the majority opinion is in effect requiring police to meet a higher standard of proof than reasonable articulable suspicion, a standard even higher (it would seem) than probable cause. This would be a requirement that unnecessarily adds to the jeopardy of police officers conducting traffic stops and others in the vicinity of those stops, and in other contexts as well.

This court should conclude that under the totality of the circumstances, Officer Akhtar had reasonable articulable suspicion that appellant was armed and dangerous because he concealed a gun in his jacket; and we should uphold the denial of appellant's motion to suppress the gun recovered from his jacket and affirm appellant's conviction.

---

[23] *Long*, 463 U.S. at 1049 (emphasis added).